126 N.J. Super. 53 (1973)
312 A.2d 677
RUTGERS COUNCIL OF THE AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, PLAINTIFF-APPELLANT,
v.
THE NEW JERSEY BOARD OF HIGHER EDUCATION AND RALPH A. DUNGAN, AS CHANCELLOR OF HIGHER EDUCATION, AND INDIVIDUALLY, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued November 7, 1973.
Decided November 27, 1973.
*56 Before Judges CARTON, SEIDMAN and GOLDMANN.
Mr. Joel H. Sterns argued the cause for appellant (Messrs. Sterns and Greenberg, attorneys (Mr. Sterns and Mr. Michael J. Herbert, on the brief).
Mr. Arthur Winkler, Deputy Attorney General argued the cause for respondents (Mr. George F. Kugler, Jr., Attortorney General of New Jersey, attorney; Mr. Stephen Skillman, First Assistant Attorney General, of counsel; Mr. Winkler, on the brief).
GOLDMANN, J.A.D., Temporarily Assigned.
Rutgers Council of the American Association of University Professors (RC-AAUP) appeals from the whole of a resolution adopted by the Board of Higher Education (Board) on December 15, 1972, accepting the Student-Faculty Ratio Study Report prepared by the staff of the Department of Higher Education and adopting a 32-week budgetary calendar and other procedures to provide equitable funding for Rutgers University, the State University, as well as for the Newark College of Engineering and the State Colleges. These funding concepts were utilized by the Board in preparing and presenting a budget request for Rutgers to the Bureau of the Budget, Department of the Treasury, and then to the Governor and Legislature for the fiscal year 1973-1974.
RC-AAUP is the exclusively designated negotiating representative for Rutgers faculty members in their employment relations with the University. Respondent Board is an integral element of the Department of Higher Education (N.J.S.A. 18A:3-1) and responsible for the general supervision of higher education in New Jersey, as detailed in N.J.S.A. 18A:3-6 et seq. Respondent Chancellor of Higher *57 Education Dungan is likewise a principal element of the Department (N.J.S.A. 18A:3-1) and its chief executive officer (N.J.S.A. 18A:3-21).
The validity of the resolution in question is challenged on three grounds: (1) in adopting the student-faculty ratio the Board violated the procedural requirements of the New Jersey Administrative Procedure Act (N.J.S.A. 52:14B-1 et seq.); (2) the Board's unilateral adoption of the student-faculty ratio policy and 32-week budgetary calendar without prior consultation and negotiation with RC-AAUP as negotiating unit violated the New Jersey Employer-Employee Relations Act (N.J.S.A. 34:13A-1 et seq.), and (3) in adopting the student-faculty ratio policy the Board violated the autonomy of Rutgers.

I
The following factual background may be derived from the statements of facts submitted by the parties.
The State has annually appropriated money to Rutgers, even prior to its becoming the State University in 1956 when it was designated an instrumentality of the State for the purpose of providing public higher education. The funds so appropriated have generally been made available to Rutgers to allocate, within limited guidelines, according to its own priorities. The total sum appropriated each year was determined by resort to certain formulas or budgetary mechanisms. Rutgers would submit specific budget requests or recommendations to the Department for such items as instruction, research, auxiliary services and other programs. After review and revision the Department would submit the budget to the Governor through the Budget Bureau. He would then send his recommendations to the Legislature, which would ultimately determine what should be appropriated for Rutgers.
The largest component of state funds appropriated to Rutgers and other institutions of higher education has been *58 for instruction and research, and the amount for these purposes was computed by resort to the mechanism of student-faculty ratios. Thus, the funding for Rutgers was on the basis of one faculty position for every 12.6 full-time equivalent students enrolled. Quite understandably, this ratio was nothing more than a budget-generating convention. It did not necessarily relate to the actual number of students in any particular classroom, since Rutgers could allocate teaching positions internally to accord with its own priorities. Moreover, it could generate additional faculty positions by using funds derived from private and federal sources  revenues reflected in its budget requests.
The 12.6-1 student-faculty ratio actually had no analytical justification, nor did those used in connection with the Newark College of Engineering or the State Colleges. The several ratios were not grounded in rationale or in programmatic objectives. As the State's interest and efforts in providing higher education for more and more students increased, and the cost of doing so mounted, officials on both the executive and legislative levels of State Government questioned the validity of the ratios that had been used. The result was that the Legislature, on the recommendation of the Governor, appropriated $20,000 in the 1971-1972 budget for the Department to study the existing ratios in order to determine if changes were necessary. The intention was that the study be completed and considered for incorporation into the fiscal 1972-73 budget. The Director of the Budget Bureau set up certain guidelines to be followed. We are informed that the Department then established a committee made up of representatives of all public institutions of higher education, appointed by the respective institutions. Rutgers had six on the committee, one a faculty member.
As the study progressed ad hoc committees were established, made up of members of the general committee and additional individuals designated by the institutions. Rutgers *59 had representatives on all these committees. In addition, members of the Department's study team met with Rutgers administrative and faculty personnel some eight times to discuss issues related to the project. The comments, suggestions and critiques received from these sources resulted in changes in the proposed student-faculty ratios for Rutgers and the other institutions of higher education.
The study was not quite completed when Rutgers, in mid-September 1972, regularly submitted to the Department its budget request for the 1973-74 fiscal year. In a statement accompanying the request Rutgers acknowledged that the Department and the University had for more than a year been engaged in a study of appropriate ratios for funding faculty for instruction, research, curriculum development, public service and academic administration. However, no final agreement had been reached. Rutgers nevertheless agreed "to abide by a jointly determined allocation formula, but must insist on the understanding that Rutgers retains flexibility to assign faculty resources in accordance with institutional goals within reasonable limits of divergence from categories and units actually generating the faculty resources." Rutgers therefore did not consider the allocations in the detailed budget as final; rather, they were subject to change when a final determination was reached. It made clear that it could not accept a budget based on a student-faculty ratio formula alone. While Rutgers recognized that a formula budget based on cost per student had validity for elements of the budget impacted by students, that procedure would adversely affect areas of the budget not tied directly to students, e.g., expenditures for separately budgeted research, library functions serving industrial research and rendering public service to the community beyond the University.
After some 15 months of intensive study and discussion the Department in November 1972 submitted to the Board a staff report: "Final Report and Staff Recommendations and Student/Faculty Ratios for Rutgers University, NCE *60 [Newark College of Engineering] and the New Jersey State Colleges." There followed the Board resolution of December 15, 1972, adopting the recommendations for new budgetary procedures set out in the study report.
The introduction to the report notes that the study was an essential part of the new budgeting approach initiated in 1971 for New Jersey's public colleges. It would replace the older "line-item" budgets and their multiplicity of controls over specific budgetary items, with new budgeting techniques. The new approach, "based on modern techniques of planned program budgeting, seeks to group costs around general `program' centers, ascertain the costs of those programs, effectively relate them to performance objectives, and ultimately determine the effectiveness with which those objectives have been met." The student-faculty ratio study, said the report, was the first major step to deal effectively with the complexities attending determination of per student cost. Several reasons made the ratio a crucial ingredient: (1) faculty salaries, the largest item in a college budget, was the most important element in determining cost per student; (2) variations in the educational costs of different categories of students are largely caused by differences in their faculty resource requirements, and (3) since the faculty are at the core of most aspects of college and university life, a study of their activities is central to an understanding of higher education budgeting.
The report describes the student-faculty ratio as follows:
Quite simply the student-faculty ratio is the number of students per faculty member, for any given category of students. The student-faculty ratio is a budgetary device used in connection with enrollment projections to generate faculty lines for a school. The formula generated faculty lines multiplied by the average salary for a faculty member yields the dollar amount required for academic lines in The Instruction and Departmental Research (IDR) budget of the school. The IDR budget together with the 12 other budget categories, including organized research, extension and public service, auxiliary services, physical plant, student services, etc., comprise the total institutional budget.
*61 The single, most important difference between the new system and the old, the report went on to explain, is that the old unitary ratio (e.g., for Rutgers, one faculty member for every 12.6 students) had been divided into a number of differentiating components: by student levels, by subject matter areas, and by faculty functions.
Pursuant to its statutory duties to receive, coordinate, balance and present an annual budget request for the University, N.J.S.A. 18A:3-14(f), the Board reviewed Rutgers' budget proposal and presented a budget request for the University, through the Bureau of the Budget, to the Governor and the Legislature. This request incorporated the new budgetary mechanisms contained in the study report. It was accompanied by Rutgers' original budget request of September 15, 1972. Thereafter, in accordance with the statutory procedures set out in N.J.S.A. 52:27B-10 et seq. and N.J.S.A. 52:11-32 to 35, the budget requests for Rutgers were considered by the Budget Bureau, the Governor and the Legislature, culminating in the Appropriations Act for the fiscal year 1973-74.
Rutgers had requested $76,475,649. The Department reduced his figure to $72,936,000 and transmitted the revised budget to the Budget Bureau in December 1972. After review by the Bureau the Governor requested $72,053,310 of the Legislature.

II
Appellant RC-AAUP first argues that the Board, in adopting the December 15, 1972 resolution, violated the procedural requirements of the New Jersey Administrative Procedure Act, N.J.S.A. 52:14B-1 et seq., which contains safeguards for parties who might be affected adversely by "administrative rules and regulations" adopted by "State agencies," N.J.S.A. 52:14B-4. This section of the Act requires that prior to the adoption of a rule the agency shall (1) give at least 20 days' notice of its intended action, *62 setting out the terms and substance thereof and the time when, the place where and the manner in which interested persons may present their views  the notice to be published in the New Jersey Register, and (2) afford interested parties reasonable opportunity to submit data, views or arguments, orally or in writing, and fully consider all submissions. Admittedly, none of this was done when the resolution was adopted. Appellant points out that N.J.S.A. 52:14B-2(a) makes it clear that respondent Board is a state agency that must comply with the Administrative Procedure Act. Subsection 2(a) provides that "state agency" shall include each of the principal departments in the executive branch of the State Government, and all boards * * * within any such departments * * * authorized by statute to make, adopt or promulgate rules or adjudicate contested cases." (The excepting clause of this definition is clearly inapplicable to respondents.)
The Department of Higher Education is a principal department, N.J.S.A. 18A:3-1, and respondent Chancellor is its chief executive officer and a member of the Governor's cabinet. The Board of Higher Education is an element within the Department structure; it has the power to make, alter, repeal and enforce rules for carrying out the statute. Accordingly, it is subject to the Act.
The core issue here is obviously whether the Board was engaged in rule-making when it adopted the resolution under attack. Respondents contend that what the Board did cannot be construed as rule-making within the definition contained in N.J.S.A. 52:14B-2(e):
"Administrative rule" or "rule," when not otherwise modified, means each agency statement of general applicability and continuing effect that implements or interprets laws or policy, or describes the organization, procedure or practice requirements of any agency. The term includes the amendment or repeal of any rule, but does not include: (1) statements concerning the internal management or discipline of any agency; (2) intra-agency and inter-agency statements; and (3) agency decisions and findings in contested cases. *63 They also maintain that budget requests submitted to the Legislature, including those from various agencies of State Government as well as the Governor's proposed budget, are, whatever their form, only recommendations. No one is directly affected by any such recommendation: its effect depends upon the Legislature's concurring therein. The legislative process accords anyone opposing the recommendation full opportunity to address his objections to the Legislature. N.J.S.A. 52:11-32 et seq.; N.J.S.A. 52:13C-18 et seq.; N.J. Const. (1947), Art. IV, § IV, par. 6. And if the Legislature nevertheless accepts the recommendation, judicial review is available. Respondents therefore contend that it is the action of the Legislature, and not that of the recommending agency, which is properly the subject of judicial challenge. In short, respondents argue that the budget recommendation submitted by an administrative agency to the Legislature may not be collaterally attacked in the courts, as RC-AAUP seeks to do here in challenging the student-faculty ratio funding formula.
It is generally recognized that, within their allotted sphere, rules and regulations of a state administrative agency, duly promulgated under properly delegated powers, have the force and effect of law. State v. Atlantic City Electric Co., 23 N.J. 259, 270 (1957). It may reasonably be inferred from this principle that rules have a binding effect on all persons subject to them. They must be obeyed. Accordingly, analysis of the Board's resolution in light of the first sentence of N.J.S.A. 52:14B-2(e), quoted above, is appropriate in order to determine whether it bound Rutgers in any continuing, effective and fundamental way.
The Rutgers Board of Governors is responsible in the first instance for the preparation of the University budget. Once formulated it is forwarded to the Board of Higher Education which, as earlier stated, has the duty of coordinating and balancing all requests from the State's institutions of higher learning, and then submitting a combined request *64 for appropriations to the Governor. N.J.S.A. 18A:3-14(f). The responsibility of the Board to make a budget request for Rutgers to the Governor and the Legislature is specifically stated in N.J.S.A. 18A:65-25(b). The Board's adoption of the student-faculty funding ratio was consonant with its recommending or requesting authority under these two statutes.
The formula was not self-executing. It had no independent operative effect merely because the Board, in its considered judgment, decided to adopt it. Like all budget requests from spending agencies, the budget proposal for Rutgers (and also the Newark School of Engineering and the State Colleges), as well as the budget conventions used to formulate the budget, had to be reviewed, investigated and, if deemed necessary, amended by the Bureau of the Budget, the fiscal advisor to the Governor. (It should be noted here that the Bureau had before it the budget requests and recommendations of Rutgers along with those forwarded by the Board of Higher Education. It is our understanding that the Legislature did, too.) When the Budget Bureau completed its work, the Rutgers budget had to be concurred in by the Governor and, ultimately, the Legislature. That body had the discretion and authority to accept, reject or modify the budget proposal presented by the Board or the University. In fact, it had the power to formulate a budget of its own. What the Legislature did was not to reject or change the funding techniques recommended by the Board and concurred in by the Governor, but to adopt and implement them through the Appropriation Act for fiscal 1973-1974.
Realistically, then, appellant's dispute is with the Legislature in implementing the new funding policy, and not with the Board which embodied it as a recommended procedure in forwarding Rutgers' budget request after subjecting it to review. But looking at the Board resolution itself, as though no further action by Budget Bureau, Governor or Legislature were involved, we do not consider the resolution *65 as an exercise in rule-making. Rule-making, as respondents point out, resembles in many respects the enactment of statutes, and characteristically involves the adoption of rules establishing a pattern to be followed thereafter in a certain group of matters and governing the rights, duties and obligations of large numbers of individuals. See, e.g., Boller Beverages, Inc. v. Davis, 38 N.J. 138, 151-152 (1962).
What the Board was doing by its resolution was to adopt a budget generating device. It established certain student-faculty ratios and a 32-week academic year, and this represented its considered judgment in recommending the extent to which the State should fund higher education, including Rutgers' needs. In this connection it should not be overlooked that once the Appropriation Act was passed, Rutgers was not inexorably bound by the ratio. The Board's adoption of the ratio study report meant only that Rutgers would, in the end, presumably be allotted funds by the Legislature in accordance with the student-faculty funding ratios. The resolution did not control Rutgers' application of total available funds, including moneys received from other sources. It is to be remembered that, as noted earlier in this opinion, when Rutgers forwarded its 1973-74 budget request it insisted on its right to make reasonable deviations from the funding lines embodied in the ratios, in order to meet institutional goals. Those goals are, of course, the internal affair of the University.
We accordingly hold that the resolution is not a rule within the contemplation of the Administrative Procedure Act.

III
We find equally unconvincing RC-AAUP's argument that the Board's unilateral adoption of the student-faculty ratio policy and 32-week budgetary calendar violated the Employer-Employee Relations Act, N.J.S.A. 34:13A-1 et seq.
*66 Appellant had served as principal spokesman for the Rutgers faculty before that law was enacted. The statute simply gave this traditionally observed relationship a formalized legal basis. Pursuant to that law RC-AAUP and the administration at Rutgers entered into collective negotiating agreements, including one executed on December 1, 1970 and modified on April 29, 1971. By mutual oral agreement of the parties its terms were still in effect when this appeal was brought.
Section 7 of the Employer-Employee Relations Act (N.J.S.A. 34:13A-5.3) provides that a majority representative of public employees in an appropriate unit may act for all employees in the unit. Further, that the majority representative and designated representatives of the public employer shall meet at reasonable times and negotiate in good faith with respect to grievances and the terms and conditions of employment. When an agreement is reached, these terms and conditions are to be embodied in a signed writing. The Legislature never defined what it meant by "terms and conditions," nor did it specify what subjects were negotiable and what subjects were outside the sphere of negotiation. Section 10 (N.J.S.A. 34:13A-8.1) expressly provided that no provision in the Act shall "annul or modify any statute or statutes of this State." As a reviewing court, we must give continuing effect to the provisions of the law relating to the Department of Higher Education, N.J.S.A. 18A:3-1 et seq., without frustrating the goals or terms of the Employer-Employee Relations Act. Appellant claims that the Board of Higher Education should have negotiated the student-faculty ratio funding formula with RC-AAUP before adopting it, and this for the reason that the formula imposed certain workloads, class sizes, class hours, et cetera, on the Rutgers faculty. Not so.
We have heretofore observed that the Board is vested with a duty to make a budget recommendation for Rutgers, pursuant to N.J.S.A. 18A:3-14(f) and 18A:65-25(b). *67 We find nothing to indicate that the Legislature, when it adopted the general terms of the Employer-Employee Relations Act, contemplated that the Board of Higher Education would or could abdicate this administrative responsibility or, indeed, abdicate its management responsibilities with respect to state higher education policies.
The Board's right to make a budget recommendation for Rutgers was intended by the Legislature to be exercised freely, and in a manner that would enable it to receive an independent and analytical assessment of the budgetary needs of the University. As respondents point out, if the Employer-Employee Relations Act were construed to compel collective negotiations on the budget recommendations given to the Legislature by the Board, this obvious legislative intent would be frustrated, for the recommendations it made each year would reflect compromise and not the Board's independent judgment. As we have remarked earlier in this opinion, any member of a public or private interest group may examine any budget recommendation made by the Board and, if so minded, submit his views and appropriate data with regard thereto to the executive and legislative branches of government. This, and not collective negotiation, is the proper avenue for interested parties to follow.
The fact is that the Legislature did not impose any additional controls over collective negotiations between Rutgers and the faculty when it adopted the new funding formula recommended by the Board. It simply appropriated money for the use of the University in the same fashion as it had since 1956 when the State University was created. Rutgers received funds which it could allocate internally in accordance with its own priorities, institutional goals and privately generated faculty positions Within this framework RC-AAUP, as the exclusive negotiating agent for the faculty, was free to negotiate all terms and conditions with the University, even as it had in prior years.
*68 Finally, and to emphasize what has been said before, the budgetary policies and devices adopted by the Board in its December 15, 1972 resolution represented a proper exercise of its statutory responsibility to prepare and present an annual budget for Rutgers to the Governor and Legislature. Those policies and devices were without force or effect until the Legislature concurred in them and promulgated a budget for the University based upon them.
With regard to the 32-week budgetary calendar, we observe, as did our Supreme Court in Burlington County College Faculty Ass'n v. Board of Trustees, Burlington County College, 64 N.J. 10, decided November 20, 1973, and reversing 119 N.J. Super. 276 (Law Div. 1972), that while the calendar undoubtedly fixes when the University is open with courses available to students, it does not in itself fix the days and hours of work by individual faculty members, or their workloads or their compensation. These matters are mandatorily negotiable under the Act, although the negotiations are to be conducted in the light of the calendar. Although the calendar undoubtedly has some practical effect on employment arrangements, it was not a subject for mandatory negotiation.
We therefore conclude that the Board resolution was not a final administrative action subject to the Employer-Employee Relations Act.

IV
The third point advanced by RC-AAUP is that the Board resolution violated Rutgers' autonomy. We see no merit in the argument. In the first place, this matter is the concern of the University, acting through its Board of Governors, and not appellant's. Secondly, whatever the precise nature and amount of independence, autonomy or self-government vested in the University by law (N.J.S.A. 18A:65-27)  see, in this connection, Rutgers v. Piluso, 60 N.J. 142 (1972); Rutgers v. Kugler, 110 N.J. Super. 424 (Law *69 Div. 1970), aff'd 58 N.J. 113 (1971); Trustees of Rutgers College in N.J. v. Richman, 41 N.J. Super. 259 (Ch. Div. 1956)  what the Board did was simply to perform its statutory duty to advise and recommend to the Legislature the extent of state aid it believed appropriate and necessary for the University. It was the Legislature which adopted the new funding formula in appropriating funds for Rutgers for its instruction and departmental research use.
Appeal dismissed.