COUNCIL OF NEW JERSEY STATE COLLEGE LOCALS, NJSFT–AFT/AFL–CIO, APPELLANT, v. STATE BOARD OF HIGHER EDUCATION, RESPONDENT.

Argued March 23, 1982—Decided August 2, 1982.

*George W. Canellis* argued the cause for appellant (*Sauer, Boyle, Dwyer & Canellis*, attorneys).

*Robert A. Fagella*, Deputy Attorney General, argued the cause for respondent (*Irwin I. Kimmelman*, Attorney General of New Jersey, *Erminie L. Conley*, former Assistant Attorney General, of counsel).

The opinion of the Court was delivered by

HANDLER, J.

This case requires us to determine whether a State agency can pass regulations establishing terms and conditions of employment directly affecting its own employees without submitting those matters to collective negotiations.

In *State v. State Supervisory Employees Ass'n*, 78 *N.J.* 54, 81 (1978), we held that "the adoption of any specific *statute* or *regulation* setting or controlling a particular term or condition of employment will preempt" negotiation on that subject. However, that case involved regulations passed by the Civil Service Commission, a State executive department with regulatory jurisdiction over all public employees in the classified civil service. In contrast, this case involves regulations promulgated by the State Board of Higher Education, which is an agency with statewide regulatory jurisdiction over the field of higher education, including State college employees.

The present dispute arose over the Board's adoption of certain regulations establishing uniform procedures for staff reductions at State colleges during periods of fiscal exigency. *N.J.A.C.* 9:2–3.1 *et seq.* On or about May 2, 1980, Chancellor T. Edward Hollander formulated regulations and forwarded them to the Board for its approval. The Council of New Jersey State College Locals, NJSFT–AFT/AFL–CIO, which is the exclusive representative for all full-time faculty and nonmanagerial and professional employees in the State college system, was not consulted and did not participate in the preparation of these proposals.[1] Moreover, the Board rejected the Council's repeated requests that the proposed regulations be submitted to collective negotiations before their adoption. The regulations were adopted and went into effect on February 4, 1981. 13 *N.J.R.* 133(h).

The Council brought this action, challenging the preemptive effect of these rules on collective negotiations. The Appellate Division held, on the strength of *State Supervisory*, that negoti-

---

[1]Since it became the exclusive representative for this union in 1973, the Council has negotiated a series of collective agreements with the State. Some of those agreements have included provisions covering the same topic of faculty layoffs addressed by the regulations under attack on this appeal. Moreover, the parties apparently have sometimes used the negotiations process to reach agreement on proposals for changes in administrative regulations, which were then passed on to the Board of Higher Education for formal action.

ation was preempted on the subjects specifically covered by the regulations. 181 *N.J.Super.* 179 (1981). We granted the Council's petition for certification. 89 *N.J.* 398 (1982).

I

The State Board of Higher Education functions as an agency within the State Department of Higher Education. It possesses broad regulatory authority over the State college system. See *Assoc. of N. J. State Col. Fac. v. Dungan*, 64 *N.J.* 338, 350–51 (1974). The Legislature has granted the Board "exclusive jurisdiction over higher education in this State and its constituent parts and the requisite power to do all things necessary and proper to accomplish the aims and carry out the duties provided by law." *N.J.S.A.* 18A:3–13. The Board is responsible for taking steps

> to advance long-range planning for the system of higher education as a whole in the state; establish general policy for the governance of the separate institutions; coordinate the activities of the individual institutions which, taken together, make up the system of higher education in New Jersey; and maintain general financial oversight of the state system of higher education. [*N.J.S.A.* 18A:3–13]

Moreover, the Board has the power to "establish general personnel policies for the public institutions of higher education," *N.J.S.A.* 18A:3–14(h); to "adopt bylaws and [to] make and enforce, alter and repeal rules for its own government and for implementing and carrying out this law," *N.J.S.A.* 18A:3–15; and to exercise "all powers in addition to those specifically provided by law, requisite to the performance of its duties," *N..˜ S.A.* 18A:3–16.

The regulations challenged in this case represent a comprehensive attempt "to preserve the academic integrity of the institutions while respecting the rights of the individual [employees] involved" in the event of a financial crisis at any of the state colleges. This aim is accomplished by establishing a process for determining when a fiscal emergency exists and implementing a plan to meet the crisis, *N.J.A.C.* 9:2–3.1, –3.2; by offering a framework to guide the Board in deciding how to

reduce expenses while still maintaining the academic integrity of the college, *N.J.A.C.* 9:2–3.5; by requiring consideration of alternatives other than layoffs, *N.J.A.C.* 9:2–3.2; by demanding that any layoffs which do result "be based on academic or administrative considerations" and that programs and functions of major instructional or administrative importance be protected, *N.J.A.C.* 9:2–3.5; by requiring consideration of possible impacts on affirmative action, *N.J.A.C.* 9:2–3.4; by calling for consultation with the college community before formulating any reduction plan to accommodate the views of those who may be affected, *N.J.A.C.* 9:2–3.3; by providing notice to the employee unit's representative and requiring fulfillment of agreed-upon contractual obligations, *N.J.A.C.* 9:2–3.5; and by requiring notice of staff reductions and efforts directed at the reemployment of those who are laid off, *N.J.A.C.* 9:2–3.6, –3.11. These procedures for declaring a fiscal emergency and reducing the work force have yet to be invoked at any of the state colleges.

The Council argues that these regulations should not be given preemptive effect because the agency that promulgated them also acts as an employer over the very employees that it also regulates. The Council claims that giving preemptive effect to agency regulations affecting terms and conditions of employment would allow the agency to use its regulatory power in an abusive manner to deprive its own employees of their statutory right to participate in the process that governs their employment.

■ We note at the outset that the public employees of this State have a constitutional right to organize and to present "grievances and proposals through representatives of their own choosing." *N.J.Const.* (1947), Art. I, par. 19. The Legislature has attempted to define the scope of that right in the New Jersey Employer-Employee Relations Act, *N.J.S.A.* 34:13A–1 *et seq.* That Act provides that "the majority representative and designated representatives of the public employer meet at reasonable times and negotiate in good faith with respect to griev-

ances and terms and conditions of employment." *N.J.S.A.* 34:13A–5.3. Therefore, like private employees, public employees have the right to engage in collective negotiation on terms and conditions of employment.

However, that right is limited when the subject matter sought to be negotiated is already addressed by legislation. In *State Supervisory*, we held that "the adoption of any specific *statute* or *regulation* setting or controlling a particular term or condition of employment will preempt" negotiation on that subject. 78 *N.J.* at 81. Thus, we left no doubt that the preemption doctrine applies to any validly adopted regulation, regardless of which agency or department promulgated it, provided the regulation definitively and specifically fixes a term or condition of employment. 78 *N.J.* at 80–81. As long as such a regulation is consistent with and effectuates the authority delegated to the agency by statute, it is to be given the same binding and preemptive effect that would be accorded to a statute directly establishing the requirements contained in the regulation. See *In re IFPTE Local 195 v. State*, 88 *N.J.* 393, 403–04 (1982).

The unique feature of this case, not present in *State Supervisory*, is that the regulatory agency involved also performs certain employer functions regarding the same employees that it regulates. The Board of Higher Education is part of the Department of Higher Education. *N.J.S.A.* 18A:3–1. While the Board itself performs only regulatory functions, the Department is responsible for assuming certain employer-type duties, such as participation in collective negotiations as part of the management team (*N.J.A.C.* 9:2–5.5) and an arbitrator's role in resolving employee grievance disputes.[2] However, the Department is

---

[2]The Department regularly participates in collective negotiations with this union in conjunction with college management. Although the Governor's Office of Employee Relations has primary responsibility for handling the State's side of negotiations with this union, representatives of the Department also participate and have done so at every collective negotiation since the Council became the unit's negotiating representative. See *N.J.A.C.* 9:2–5.-

not the sole, nor even the primary employer of State college workers. The individual administrations at each college are primarily responsible for their own employees, *N.J.S.A.* 18A:3–13, and the Governor's Office of Employee Relations is in charge of negotiating collective bargaining agreements for the State. See *Association of New Jersey College Faculties, Inc. v. Board of Higher Education*, 112 *N.J.Super.* 237, 242–50 (Law Div.1970). Nevertheless, the Department does, in certain respects, act as the employer of State college workers represented by the Council. Therefore, the same agency is performing both regulatory and, to a lesser extent, employer functions over this group of employees.

When an agency performs dual roles ·as both regulator and employer, the possibility exists that the agency could use its preemptive regulatory power in an abusive or arbitrary manner to insulate itself from negotiations with its employees. The mere potential for such abuse is not grounds in and of itself to hold that preemption does not apply to regulations promulgated by such agencies. However, that possibility raises serious ques-

---

5(a). The Department has been named as a party in at least three of the collective agreements negotiated by the Council. The June 29, 1977 agreement was signed by representatives of both the Office of Employee Relations and the Chancellor of Higher Education (the chief executive officer of the Department and secretary of the Board, *N.J.S.A.* 18A:3–12, –20). The Board has even codified the Department's negotiating role in *N.J.A.C.* 9:2–5.5(a), which provides:

> For purposes of collective negotiation on all economic issues and all issues determined by the employer to be applicable to all public institutions of higher education, the employer's representative is a Negotiating Committee comprised of representatives of the institution or institutions, the Department of Higher Education, and the Office of the State Negotiator. On all other issues the employer's representative is the governing board of the public institution of higher education.

> In addition, the Department plays a significant role in resolving employee grievances. Formal employee grievances are initially processed by the president of the college involved and next submitted to the Chancellor, who must hold a hearing and issue a written decision on the matter. The union may then contest the Chancellor's decision through arbitration.

tions about the soundness of any rule that would accord absolute and unqualified preemption to a regulation affecting terms and conditions of employment when passed by an agency *qua* employer to govern the employment terms and conditions of its own employees. To effectuate fully the legislative policy of protecting the rights of State public employees, while at the same time encouraging the proper discharge of statutory responsibilities by State agencies, the preemption accorded to administrative regulations governing the employment of an agency's own employees must be qualified.

The determination whether an agency regulation affecting terms and conditions of employment should be given preemptive effect may depend upon the direct application of the regulation to the agency's own employee and the agency's posture vis-a-vis the employees affected by the regulation. We therefore hold that if the agency acts solely as a regulator and has no direct employer interest over the employees affected, its regulations fixing terms and conditions of employment must be given the same preemptive effect as a statute. See *Bethlehem Tp. Bd. of Ed. v. Bethlehem Tp. Ed. Assn.*, 91 *N.J.* 38 (1982); *State Supervisory*, 78 *N.J.* at 80–82. However, if the agency acts in dual capacities and promulgates a regulation affecting employees under its control, its regulations establishing terms and conditions of employment will not necessarily preempt negotiation on the subject matter covered therein. In this latter setting, preemption will be presumed. However, that presumption can be overcome by demonstrating that the regulations were arbitrary, adopted in bad faith, or passed primarily to avoid negotiation on terms and conditions of employment. When such a showing is made, the regulations will not be given preemptive effect. Relevant factors in rebutting the presumption would include: (1) the extent to which the regulation was consistent with or necessary to effectuate the agency's statutory authority; (2) the relationship between the regulation and the exercise of the agency's regulatory jurisdiction; (3) the scope of the agency's employer role; (4) the agency's rationale for adopt-

ing the regulation; (5) the circumstances under which the regulation was adopted; (6) the scope and composition of the class of employees affected by the regulation; (7) the basic fairness of the regulation to the employees affected; and (8) the extent to which the employees or their representatives had the opportunity to express their views on the regulation during its formative stages.

In this case, there can really be no doubt that despite the agency's employer role, the regulations deserve preemptive treatment. The Board enjoys broad regulatory authority over the State college system. See *N.J.S.A.* 18A:3–13, –14, –15 and –16. The agency's employer role, while considerable in certain respects, was basically secondary in comparison with its regulatory responsibilities. Moreover, the Board had sound reasons for adopting these regulations. They address a matter of major concern to the Board, namely, the functioning of the State college system in a crisis situation. Additionally, the regulations appear reasonable and fair to the employees affected.[3] Furthermore, there is no indication of suspicious circumstances surrounding their passage. There had been some negotiating problems at the time of passage. However, those problems apparently had nothing to do with how to make staff reduction decisions during periods of fiscal exigency. In addition, the employee union had adequate notice and full opportunity to express its views on the regulations at the proposal stage. Consequently, we find that these regulations were passed in good faith and are, to the extent that they specifically address the subject of procedures for making staff reductions at State

---

[3]Petitioner argues that these regulations are unfair because they affect only employees in the bargaining unit that petitioner represents. This assertion is inaccurate. These regulations apply to all non-Civil Service employees in the State college system, and not just those represented by petitioner. Specifically excluded from the Council's unit are "vice-presidents, deans, associate and assistant deans and other managerial executives," yet all of these individuals are subject to the regulations.

colleges during fiscal emergencies, deserving of preemptive treatment.

## II

The question whether these regulations serve to preempt negotiation requires further analysis. The preemption doctrine applies to regulations "which expressly set terms and conditions of employment." *State Supervisory*, 78 *N.J.* at 80. Thus, the regulation must fix a term and condition of employment, and it must so provide expressly, specifically and comprehensively in order to foreclose otherwise required employer-employee negotiations on the subject matter.

### (A)

The initial or threshold consideration is whether the regulations· address a term or condition of employment that would ordinarily require negotiation. Only when an administrative regulation addresses a topic otherwise subject to mandatory negotiation would the preemption doctrine become relevant because only then could the regulation actually serve to bar negotiations.

Public employment negotiation in New Jersey has divided into two distinct categories: matters that are nonnegotiable because they involve governmental policy and "mandatorily negotiable terms and conditions of employment." [4] *Ridgefield Park Ed. Ass'n v. Ridgefield Bd. of Ed.*, 78 *N.J.* 144, 162 (1978). Negotiation is required only regarding those terms and conditions of employment· "which intimately and directly affect the work and welfare of public employees and on which negotiated agreement would not significantly interefere with the exercise

---

[4]There are generally no permissive subjects of negotiation in New Jersey public employee negotiation. *Bd. of Ed. of Woodstown-Pilesgrove v. Woodstown-Pilesgrove Ed. Ass'n*, 81 *N.J.* 582, 588 n.1 (1980); *Ridgefield Park Ed. Ass'n v. Ridgefield Bd. of Ed.*, 78 *N.J.* 144, 162 (1978).

of inherent management prerogatives pertaining to the determination of governmental policy." *Bd. of Ed. of Woodstown-Pilesgrove v. Woodstown-Pilesgrove Ed. Ass'n*, 81 *N.J.* 582, 591 (1980), quoting *State Supervisory*, 78 *N.J.* at 67. *Accord, Local 195*, 88 *N.J.* at 404.

Cases involving the Board of Higher Education have adhered to this same analysis for making scope of negotiation determinations. In *Ass'n of State College Faculties v. N. J. Bd. of Higher Ed.*, 66 *N.J.* 72, 76–77 (1974), this Court held that Board-promulgated guidelines on outside employment should have been negotiated before their adoption because they "directly affected the work and welfare of the college employees, related to the terms and conditions of [the teachers'] employment . . . and did not affect any major educational policy." See also *Dungan*, 64 *N.J.* 338 (criteria for tenure nonnegotiable); *Rutgers Council v. N. J. Bd. of Higher Ed.*, 126 *N.J.Super.* 53 (App.Div.1973) (unilateral adoption of student-faculty ratio and budgetary calendar without prior negotiation did not violate Employer-Employee Relations Act).

In this case, the regulations constitute a detailed and comprehensive scheme for determining and handling a financial crisis at any of the State colleges. They give the board of trustees at each college the authority to declare a state of fiscal emergency at the college and to direct the president of the institution to formulate a plan for dealing with the emergency. *N.J.A.C.* 9:2–3.1, –3.2. They offer a framework to guide the board in deciding how to reduce expenses while maintaining the academic integrity of the institution. *N.J.A.C.* 9:2–3.5. They require that affirmative action be considered in making staff reduction decisions. *N.J.A.C.* 9:2–3.4. They call for the participation of the college community in developing recommendations to be submitted for the board's approval. *N.J.A.C.* 9:2–3.3. And they provide for notice of staff reductions and reemployment of those who are laid off. *N.J.A.C.* 9:2–3.6—3.11.

■ To the extent that the regulations challenged in this case involve the substantive criteria for determining the existence of a fiscal emergency, the necessity for making staff reductions, and the reemployment of laid-off employees, they are clearly nonnegotiable as matters of managerial prerogative pertaining to the determination of governmental policy. However, to the extent that they address matters not involving substantive governmental discretion and responsibility, but merely the procedural aspects of reaching and effectuating such determinations, they concern terms and conditions of employment ordinarily subject to negotiation.

In *Local 195*, we held that the actual transfer or reassignment of an employee is not mandatorily negotiable because the substantive decision to transfer or reassign an employee is preeminently a governmental policy responsibility that would be significantly encumbered or impaired if it were subject to mandatory negotiation. 88 *N.J.* at 417. *Cf. Id.* at 408 (subcontracting held nonnegotiable); *Ridgefield Park*, 78 *N.J.* at 156 (teacher transfers or reassignments are not mandatorily negotiable); *Dunellen Bd. of Ed. v. Dunellen Ed. Ass'n*, 64 *N.J.* 17, 25 (1973) (local school board's decision to consolidate two department chairmanships found to be nonnegotiable); *In re Maywood Bd. of Ed.*, 168 *N.J.Super.* 45, 55–58 (App.Div.), certif. den., 81 *N.J.* 292 (1979) (neither the decision to reduce teaching staff nor the impact of such a reduction is negotiable); *Wyckoff Tp. Bd. of Ed. v. Wyckoff Ed. Ass'n*, 168 *N.J.Super.* 497 (App.Div.), certif. den., 81 *N.J.* 349 (1979) (local school board's practice of "ranking" nontenured teachers and criteria used for determining whether to renew the contracts of such teachers are nonnegotiable subjects); *Union County Regional Bd. of Ed. v. Union County Regional High School Teachers Ass'n*, 145 *N.J.Super.* 435 (App. Div.1976), certif. den., 74 *N.J.* 248 (1977) (teacher layoffs and staff reductions held nonnegotiable).

However, we also recognized in *Local 195* the distinction between the public employer's *substantive* decision to transfer or assign employees and the *procedural* process to be followed in

making such a decision. We ruled that the former constitutes inherent managerial prerogatives, while the latter does not. Thus, we held that the procedures for implementing substantive decisions relating to transfers and reassignments are subject to mandatory negotiation because procedural matters pose no significant threat of interference with the public employer's ability to make substantive policy determinations. 88 *N.J.* at 417. See *Bethlehem*, 91 *N.J.* at 47 (distinction drawn between evaluation criteria and evaluation procedures); *State Supervisory Employees*, 78 *N.J.* at 90–91 (promotional criteria are nonnegotiable, while promotional procedures are negotiable); *North Bergen Tp. of Ed. v. North Bergen Fed. Teachers*, 141 *N.J.Super.* 97 (App.Div.1976) (promotional criteria must be left to the local board as a matter of educational policy but procedures by which promotional vacancies are filled should be negotiated); *South River Bd. of Ed.*, 5 *NJPER* 30 (¶ 10020 1978) (procedures for layoffs or staff reductions are negotiable if not preempted by statute or regulation).

The regulations challenged in this case include the *procedural* aspects of making staff reductions during a fiscal emergency. Subjecting the issue of procedures to mandatory negotiation would have no significant effect upon any major educational policy. Therefore, we find that the procedural aspects of the subject matter addressed by these regulations would require negotiation unless otherwise preempted by the specific terms of the regulations themselves.

(B)

Negotiation on terms and conditions of employment will be preempted by a duly enacted regulation if the regulation addresses the particular term or condition "in the imperative and leave[s] nothing to the discretion of the public employer." *State Supervisory*, 78 *N.J.* at 80. Thus, if a regulation admits of some discretion, as where it sets only a minimum or maximum term or condition, then negotiation is required, provided it is

confined within the parameters established by those limits. *Id.*
78 *N.J.* at 80–82.

In many respects, the regulations in this case are suffi-
ciently specific regarding procedures to warrant giving them
preemptive effect. However, while these regulations are bind-
ing and cannot be altered by contractual agreement, they do not
preclude negotiation on additional procedures consistent with
the procedural mechanisms in the regulations. For example,
*N.J.A.C.* 9:2–3.6 allows the Board "at least two weeks" in which
to give notice of proposed layoffs. Setting a longer period of
time for giving notice remains open to negotiation. And *N.J.
A.C.* 9:2–3.7 requires the Board to give layoff notices to individ-
ual employees "as soon as possible." This indefinite time frame
also remains open for negotiation. In regard to reemployment,
*N.J.A.C.* 9:2–3.8 authorizes the rehiring of faculty members
"who the President believes, as a result of his academic judg-
ment, are qualified to fill the position." The procedures relating
to rehiring, including notice and rudimentary due process, vital-
ly affect employment interests and are negotiable.[5] *Cf. Donald-
son v. Bd. of Ed. of No. Wildwood,* 65 *N.J.* 236 (1974) (even
nontenured teacher entitled to rudiments of due process as to
nonrehiring). Thus, the regulations do not prohibit negotiation

---

[5]Adequate procedural requirements in terms of teacher layoffs and rehiring
are important to achieve educational goals as well as to protect employee
interests. The declaration of a fiscal emergency should not be used to subvert
academic freedom. *Cf. American Assoc. of Univ. Profs. v. Bloomfield Co.,*
129 *N.J.Super.* 249 (Ch.Div.1974), aff'd, 136 *N.J.Super.* 442 (App.Div.1975)
(college used financial difficulties as a subterfuge to remove tenured teach-
ers). See also *Browzin v. Catholic University of America,* 527 *F.*2d 843
(D.C.Cir.1975).

It may be noted further that *N.J.S.A.* 18A:60–3, which recognizes that
there are circumstances in which pupil reduction will cause dismissal of
tenured faculty, specifically provides that such teachers shall remain on a
preferred eligibility list "in the order of years of service for reemployment."
While this statute provides a measure of objectivity in terms of rehiring, we
need not resolve at this time the question of whether similar standards are
reasonably to be implied with respect to *N.J.A.C.* 9:2–3.8.

on additional or complementary procedural protections which are not already addressed. The parties may agree to any procedures which do not contravene the regulations or impede the operation of the regulatory scheme.

The conclusion that these regulations do not prohibit negotiation on additional procedures consistent with the regulations is supported by the fact that the regulations themselves require that the lines of communication be left open. In developing a plan to deal with a fiscal emergency, the college president must "consult with the college community." *N.J.A.C.* 9:2–3.3. Thus, these regulations do not simply permit discussion between the parties. They mandate that such discussions take place. As we noted in *Local 195*, discussions between public employees and public employers further the public interest by promoting labor peace and by generating suggestions from public employees on how to improve the efficiency or fairness of public programs. 88 *N.J.* at 409. In this case, discussions about the steps to be taken in a fiscal emergency are not only advisable but legally required. Therefore, while these regulations preempt negotiation on those terms and conditions of employment which they specifically address, they still leave certain matters to be negotiated in terms of procedures for making staff reductions at State colleges during periods of financial crisis.

### III

The final issue in this case is whether the regulations violate the State's tenure statute, *N.J.S.A.* 18A:60–1 *et seq.* The Council claims that these regulations, which, among other things, encourage schools to consider affirmative action in making staff reduction decisions, *N.J.A.C.* 9:2–3.4, violate the tenure statute's provision that dismissals of tenured faculty be based on seniority.

The relevant statutory provision, *N.J.S.A.* 18A:60–3, reads as follows:

> Nothing contained in this chapter shall be held to limit the right of the commissioner in the case of any educational institution conducted under his jurisdiction, supervision or control, or of the board of trustees of a college, in the case of a college, to reduce the number of professors, associate professors, assistant professors, instructors, supervisors, registrars, teachers, or other persons employed in a teaching capacity in any such institution or institutions when the reduction is due to a natural diminution of the number of students or pupils in the institution or institutions. Dismissals resulting from such reduction shall not be by reason of residence, age, sex, marriage, race, religion, or political affiliation. When such professors, associate professors, assistant professors, instructors, supervisors, registrars, teachers, or other persons employed in a teaching capacity under tenure are dismissed by reason of such reduction those professors, associate professors, assistant professors, instructors, supervisors, registrars, teachers, or other persons employed in a teaching capacity having the least number of years of service to their credit shall be dismissed in preference to those having longer terms of service.

The tenure statute clearly refers to teaching staff reductions necessitated by a "natural diminution in pupils." However, the statute makes no reference to the specific subject matter addressed by these regulations—that of how to make faculty layoff decisions at State colleges during periods of fiscal emergency. Moreover, this Court has recognized that the statutory protections of tenure are inapplicable in cases of fiscal emergency. See *Nichols v. Bd. of Ed. of Jersey City*, 9 *N.J.* 241 (1952) (statute referring to reductions of staff due to "natural diminution" held inapplicable to layoffs necessitated by financial emergency).

Statutes should be read in a reasonable manner to include only those situations legitimately contemplated by the Legislature. See, *e.g.*, *Loboda v. Clark Township*, 40 *N.J.* 424 (1963). In the tenure context, it seems clear that the Legislature did not intend that its tenure laws supercede otherwise valid regulations that address concerns not encompassed by the tenure laws, including those designed to address crisis situations.

The Council reads the tenure laws to require that layoff decisions always be based on seniority. Therefore, it contends that these regulations conflict with the tenure statute's seniority approach because, for example, they encourage the colleges to consider affirmative action in making staff reduction decisions.

See *N.J.A.C.* 9:2–3.4. In making this argument, the Council fails to appreciate that the Board enjoys broad discretion in regulating the State college system. See *N.J.S.A.* 18A:3–13, –14, –15 and –16. It was for this reason that we rejected a similar claim in *Dungan*. There, the Board had adopted general guidelines for the granting of tenure to faculty members at State colleges. In rejecting the argument that these guidelines violated the tenure laws, we explained that "the Board has been legislatively vested with the power to establish tenure guidelines which it considers educationally desirable so long as those guidelines are reasonable in nature and do not impair any specific statutory provision dealing with tenure." 64 *N.J.* at 351. Because these regulations are reasonable and do not impair any specific statutory provision, we agree with the Appellate Division that they do not conflict with the State's tenure laws.

## IV

Accordingly, the judgment of the Appellate Division is affirmed as modified by this opinion.

SCHREIBER, J., concurring.

When an administrative agency promulgates a rule or regulation pursuant to its enabling statutory authority and in accordance with prescribed procedures, that rule or regulation, in the absence of a constitutional limitation, is valid and effective. Its validity does not depend on whether its own employees are directly affected. If the regulation sufficiently covers an item so that it is no longer negotiable, then the matter is preempted. Once it is determined that the rule or regulation is valid, the inquiry is at an end irrespective of whether the persons affected are employees of the promulgating agency—for that is the authority which has been vested in the governmental agency by the Legislature.

I agree with the majority's analysis of the extent of the preemption of the regulations adopted by the State Board of

Higher Education and its conclusion that the regulations do not violate the State's tenure statute, *N.J.S.A.* 18A:60–1 *et seq.*

Accordingly, I join the affirmance of the Appellate Division's judgment as modified.

SCHREIBER, J., concurring in the result.

*For affirmance as modified*—Chief Justice WILENTZ and PASHMAN, CLIFFORD, SCHREIBER, HANDLER, POLLOCK and O'HERN—7.

*For reversal*—None.