IN THE MATTER OF TOWNSHIP OF OLD BRIDGE BOARD OF EDUCATION, APPELLANT AND CROSS-RESPONDENT, v. OLD BRIDGE EDUCATION ASSOCIATION, RESPONDENT AND CROSS-APPELLANT.

Argued December 11, 1984—Decided March 21, 1985.

524

*Steven J. Tripp* argued the cause for appellant and cross-respondent (*Wilentz, Goldman & Spitzer*, attorneys; *Harold G. Smith*, of counsel).

*Sanford R. Oxfeld* argued the cause for respondent and cross-appellant (*Oxfeld, Cohen & Blunda*, attorneys).

*Don Horowitz*, Deputy General Counsel, argued the cause for Public Employment Relations Commission (*Robert E. Anderson, Jr.*, General Counsel, attorney).

*Paula A. Mullaly*, General Counsel, submitted a brief on behalf of *amicus curiae* New Jersey School Boards Association (*Ms. Mullaly*, attorney; *Susan Galante*, on the brief).

The opinion of the Court was delivered by

O'HERN, J.

The central question in this appeal is whether the authority of a local school district to make a reduction in force under *N.J.S.A.* 18A:28-9, "whenever, in the judgment of the board, it is advisable to abolish any such positions for reasons of economy * * * ", preempts negotiation of procedures for giving notice to teachers of required layoffs. We hold that procedures that do not substantially interfere with the managerial prerogative to effect the layoff are negotiable. We modify the judgment below because the sanction allowed would have the effect of substantially interfering with the determination of governmental policy.

The agreement between the Old Bridge Education Association (Association) and the Old Bridge Board of Education (Board) provides that "[t]eachers shall be notified of their contract and salary status for the ensuing year no later than April 30." In accordance with this clause, Barbara Wolfe, a tenured part-time business education teacher, was notified on April 15, 1981 that the Board had voted, at its April 6, 1981 meeting, to re-employ her as a one-fifth time business education teacher for the 1981–82 school year at a salary of $4,507.

Pursuant to the contract clause, several employees, other than Barbara Wolfe, had been notified on March 1, 1981 that they were being terminated at the end of the 1980–81 school year.

On June 29, 1981, at a special meeting, the Board of Education voted to rescind Ms. Wolfe's contract for the 1981–82 school year. By letter dated July 1, 1981, the Superintendent of Schools notified Wolfe that her contract was rescinded.

The Association filed a grievance, asserting that the Board had violated the notice requirements in the agreement. The arbitrator found that the Board had violated the contract, but did not immediately order restoration or monetary sanction because of needed evidence as to mitigation. At this point the Board filed a scope of negotiations petition with the Public Employment Relations Commission (PERC), contending that a reduction in force, including its notice and impact, is not negotiable. PERC determined that procedural aspects relating to layoffs, especially notice provisions, are negotiable and therefore arbitrable. PERC declined to speculate on the appropriateness of any potential remedy.

The Board appealed PERC's ruling to the Appellate Division. While that appeal was pending, the arbitrator entered the sanction, awarding Ms. Wolfe $5200, representing $4507 for her full year's salary (she taught one-fifth time); $350 for sick pay; and $343.75 for the costs of seeking other employment. The Association sought confirmation of the award in the Chancery Division. The Appellate Division allowed the record to be supplemented to include the award. A majority of the Appellate Division then affirmed PERC's scope of negotiations determination, finding the notice provisions negotiable and arbitrable. It exercised original jurisdiction to review the arbitrator's award and found his standard for awarding damages of a full year's salary and benefits, less mitigation, inappropriate. It would have limited a monetary sanction to whatever economic hardship the teacher suffered as a result of the late notice. 193 *N.J.Super.* 182 (App.Div.1984). The dissenting judge found

that the establishment of a period of time within which a Board would be able to reduce its staff or be liable for damages is non-negotiable and therefore non-arbitrable. He would have reversed PERC's determination and set aside the arbitrator's award in its entirety. The Board appealed pursuant to Rule 2:2–1(a)(2). We granted the Association's petition for certification. 97 *N.J.* 665 (1984).

## I.

An initial question raised by the Association is whether any judicial review of the arbitrator's award is possible in the context of this case. The Association argued that the only grounds upon which a court may vacate an arbitration award are (a) the award was procured by corruption, fraud or undue means; (b) the arbitrator evidenced partiality or corruption; (c) the arbitrator was guilty of misconduct in refusing to hear pertinent and material evidence; or (d) the arbitrator exceeded or so imperfectly executed an award that it could not be considered definite. *N.J.S.A.* 2A:24–8. The Association recognizes that the concept of "undue means" has been greatly enlarged in the public sector. *Kearny PBA Local # 21 v. Town of Kearny*, 81 *N.J.* 208, 217 (1979). It contends that the arbitrator's decision was "reasonably debatable" and is therefore insulated from review under the principle of *Kearny, supra,* 81 *N.J.* at 224. But that standard applies only to "matters of interpretation." *State v. State Troopers Fraternal Ass'n*, 91 *N.J.* 464, 469 (1982). Our task here is not to determine whether the interpretation of the language of the agreement is reasonably debatable, but rather whether the arbitrator followed the inherent guidelines applicable to public sector negotiation.

The scope of arbitrability is generally coextensive with the scope of negotiability. *Ridgefield Park Educ. Ass'n v. Ridgefield Park Bd. of Educ.*, 78 *N.J.* 144, 160 (1978). Thus the tests for each are nearly the same. Of course grievances

involving the application of controlling statutes or regulations—such as this reduction in force provision—may be subjected to resolution by binding arbitration, but not if the award has "the effect of establishing a provision of a negotiated agreement inconsistent with state statutory policy." *Teaneck Bd. of Educ. v. Teaneck Teachers Ass'n,* 94 *N.J.* 9, 15 (1983).[1]

We review this award, as the Appellate Division did, to determine whether it has the effect of establishing a term or condition of employment inconsistent with state statutory policy. That question is coextensive with the negotiability of such a term and condition of employment. Therefore, we begin our analysis with negotiability.

## II.

New Jersey has only two categories of subjects of public employment negotiation: "mandatorily negotiable terms and conditions of employment and non-negotiable matters of governmental policy." *In re IFPTE Local 195 v. State,* 88 *N.J.* 393, 402 (1982) (quoting *Ridgefield Park Educ. Ass'n, supra,* 78 *N.J.* at 162). In determining those issues that cannot be bargained away, we apply the test of negotiability.

[A] subject is negotiable between public employers and employees when (1) the item intimately and directly affects the work and welfare of public employees; (2) the subject has not been fully or partially preempted by statute or regula-

---

[1]Examples of disputes over controlling principles that may be grieved were noted in the text of *Teaneck:*

If state statutes or regulations fixed hours of employment, a wage dispute centering on whether the employee worked seven or eight hours would be arbitrable since the three criteria of the IFPTE test would be met. The dispute implicates no managerial prerogative. *See Ramapo-Indian Hills Educ. Ass'n v. Ramapo-Indian Hills Bd. of Educ.,* 176 *N.J.Super.* 35 (App. Div.1980), certif. den., 94 *N.J.* 530 (1983) (consolidation of jobs of music teacher and band director is not arbitrable but extra pay for extra work is); *Lenk v. Monmouth Reg. H.S. Dist. Bd. of Educ.,* 1980 *S.L.D.* —— (St.Bd.1980) (place on salary schedule adopted in accordance with law is arbitrable and collateral estoppel effect is given to arbitrator's award; no violation of statutory or decisional law asserted). [*Teaneck, supra,* 94 *N.J.* at 15.]

tion; and (3) a negotiated agreement would not significantly interfere with the determination of governmental policy.  [*Id.* 88 N.J. at 404.]

The parties concede that the issue intimately and directly affects the work and welfare of public employees.  The issues are (a) whether *N.J.S.A.* 18A:28-9 preempts negotiation on the subject and (b) whether arbitration of a negotiated agreement providing for notice would significantly interfere with the determination of governmental policy.

(a) *Preemption*

▉ Negotiation on terms and conditions of employment will be preempted by a statute or regulation if the provision addresses the particular term or condition "in the imperative and leave[s] nothing to the discretion of the public employer." *Local 195, supra,* 88 *N.J.* at 403–04 (quoting *State v. State Supervisory Employees Ass'n,* 78 *N.J.* 54, 80 (1978)).

Thus, if a statute or regulation provided the notice provisions to effect such a layoff, dispute would concern only the appropriate sanction.

However, we also recognized in *Local 195* the distinction between the public employer's *substantive* decision to transfer or assign employees and the *procedural* process to be followed in making such a decision.  We ruled that the former constitutes inherent managerial prerogatives, while the latter does not. Thus, we held that the procedures for implementing substantive decisions relating to transfers and reassignments are subject to mandatory negotiation because procedural matters pose no significant threat of interference with the public employer's ability to make substantive policy determinations.  [*N.J. State College Locals v. State Bd. of Higher Educ.,* 91 *N.J.* 18, 32–33 (1982), citing *Local 195, supra,* 88 *N.J.* at 417.]

Therefore, although *N.J.S.A.* 18A:28-9 reposes the substantive managerial decision of when to effect a layoff in the Board, the statute does not automatically preempt all negotiation surrounding that decision.

In *N.J. State College Locals, supra,* the Court allowed negotiation of procedures to make staff reductions during a fiscal emergency in the face of a comparable reduction-in-force provi-

sion for higher education. 91 *N.J.* at 34–35;[2] *see also Bethlehem Township Bd. of Educ. v. Bethlehem Township Educ. Ass'n,* 91 *N.J.* 38, 50 (1982) (negotiation of a procedural provision limiting observations within 10 days of a previous evaluation not a significant interference with governmental policy); *Local 195, supra,* 88 *N.J.* at 410 (allowing negotiations concerning the procedures for laying off employees).

But, giving a negotiated term a label does not resolve the issue. In *Bethlehem Township Bd. of Educ., supra,* we held that, although labeled as procedure, a requirement that the Board give five days advance notice of evaluation observations must yield to the inherent managerial interest in making unannounced observations. 91 *N.J.* at 50.

(b) *Interference With Managerial Prerogative*

█ Since all negotiation on procedures used to make a substantive decision are not preempted, we must turn to the final question—whether the negotiated provision significantly interferes with the determination of governmental policy. Almost every negotiated term of an agreement conflicts in some degree with managerial prerogative. To decide whether a negotiated agreement would significantly interfere with the determination of governmental policy, it is necessary to balance the interests of the public employees and the public employer. When the dominant concern is the government's managerial prerogative to determine policy, a subject may not be included in collective negotiations even though it may intimately affect employees' working conditions. *Board of Educ. of Woods-*

---

[2]*N.J.S.A.* 18A:60–3 reads as follows:

Nothing contained in this chapter shall be held to limit the right of the commissioner in the case of any educational institution conducted under his jurisdiction, supervision or control, or of the board of trustees of a college, in the case of a college, to reduce the number of professors, associate professors, assistant professors, instructors, supervisors, registrars, teachers, or other persons employed in a teaching capacity in any such institution or institutions when the reduction is due to a natural diminution of the number of students or pupils in the institution or institutions. * * *

*town-Pilesgrove School v. Woodstown-Pilesgrove Educ. Ass'n,* 81 *N.J.* 582, 591 (1980).

█ The dominant managerial concern here is the decision to abolish the position. That cannot be negotiated. The question is whether the employee's interest in procedurally fair notice of the layoff can be balanced with the employer's interest in fiscal management.

*N.J.S.A.* 18A:28–9 appears within the framework of Chapter 28 in Title 18A. Chapter 28 deals generally with teacher tenure and guarantees that no tenured teacher may be dismissed from a position of employment except in accordance with provisions set out in that chapter. Chapter 28 permits removal of tenured teachers for cause under *N.J.S.A.* 18A:28–5. In addition, under Article Three of Chapter 28, entitled "Effect of Reduction of Force Upon Persons Under Tenure," *N.J.S.A.* 18A:28–9 states:

> Nothing in this title or any other law relating to tenure of service shall be held to limit the right of any board of education to reduce the number of teaching staff members, employed in the district whenever, in the judgment of the board, it is advisable to abolish any such positions for reasons of economy or because of reduction in the number of pupils or of change in the administrative or supervisory organization of the district or for other good cause upon compliance with the provisions of this article.

The dominant concern of this provision is that fiscal emergencies may warrant layoffs even of tenured teachers. That dominant concern cannot be negotiated. *See Local 195, supra,* 88 *N.J.* at 405–07 (decision to replace employees by subcontracting is not negotiable). The question here is how can fair procedures for the layoff be accomodated without significant interference with educational policy.

Had this been a non-tenured teacher, the Commissioner of Education would have looked to the standard contract of employment to find the correct resolution. Under *N.J.S.A.* 18A:27–10 a non-tenured teacher must be given notice by April 30 in each year either offering employment or giving notice that the teacher will not be rehired. Under *N.J.S.A.* 18A:27–11,

failure to give such notice to a non-tenured teacher is deemed an offer of continued employment.

The State Board of Education has utilized these legislative policies of giving early notice of job expectancy to non-tenured teachers and the Commissioner has awarded such teachers pay when the notice provisions have been violated. To determine the amount of the award the State Board has drawn upon the provisions in the standard contract of employment for non-tenured teachers requiring 60 days notice of termination. *Armstrong v. East Brunswick Township Bd. of Educ.*, 1975 *SLD* 117, aff'd 1976 *SLD* 1104 (App.Div.1976) (non-tenured teacher who did not receive notice of non-renewal until two days after statutory deadline awarded 60 days salary). Had the reduction in force occurred in mid-term to a non-tenured teacher, the Commissioner would presumably draw upon the same provisions in teachers' contracts calling for 60 days notice of termination to value the claim. *Cf. Contaldi v. Board of Educ. of Jersey City* (Commissioner of Education, January 23, 1981) (non-tenured teacher awarded 60 days pay when he was not properly notified of his dismissal until the new school year had begun and he had already taught for one school day).

The Commissioner of Education has drawn upon this model in the case of tenured teachers and has held that no less protection should be afforded. *Tessa Sherman v. Board of Educ. of N. Plainfield*, 1981 *SLD* —— (October 13, 1981) (tenured teacher entitled by contract to notice by April 30 of ensuing year's contract status entitled to 60 days pay when position abolished on May 21, 1980); *see also Page v. Board of Educ. of Trenton*, 1973 *SLD* 704 (tenured teacher notified in August of elimination of position and although authority of board to abolish position is absolute, it should be exercised in regard of rights to timely notice). (For later case history, *see Page v. Board of Educ. of Trenton*, 1975 *SLD* 644, aff'd 1976 *SLD* 1158 (teacher's dismissal found to be procedurally improper and thus he was awarded back pay).) In each instance, the cases demonstrate that educational policy can accommodate the rudimenta-

ry fairness required to give timely notice of layoff or reduction in pay without significant interference with the exercise of governmental prerogative. No less consideration should be offered to the tenured teacher who has a negotiated provision for fair notice of impending layoff than to a non-tenured teacher without a negotiated notice provision.

■ The question comes down to this: what sanction will accommodate the teacher's interest in fairness with effectuation of the managerial decision? The majority of the Appellate Division quite correctly concluded that awarding a full year's pay (even with potential mitigation) would make a nullity of the Board's necessary power to reduce forces in the face of fiscal emergency. It is inevitable, with the existing budgetary process, that unanticipated changes will occur in a local school district's plans. The local budgets are now presented to the voters in April. They are sometimes defeated; but amounts may be restored later by the Commissioner. Anticipated state aid may not be known until the state budget is adopted in late June. Federal appropriations measures are rarely concluded now before September 1. With the fiscal uncertainty built into the process, we must balance the interest of the parties by allowing damages for some period of late notice rather than all the damages occasioned by the late notice. This latter resolution exposes the Board to a potential award for a full year's salary, an event that would, in effect, nullify the fiscal decision to abolish the position. The award of a full year's salary would eliminate the fiscal benefit of abolishing positions in times of economic crisis and would eviscerate the central purpose of the statute.

Accordingly, we modify the judgment of the Appellate Division insofar as it would allow a full year's damages if they were occasioned by the late notice. Since, as we have seen, the Commissioner and the State Board have measured the sanction in terms of length of breach, we believe it appropriate in these circumstances to invoke a comparable allowance of damages for the 61 days of late notice actually given in this case. In this

fashion there is no substantial impact on the managerial and statutory policy of effecting economics by layoffs. Had the late notice been for some period less than 60 days, damages for the full 60-day notice period, less mitigation, have generally been accepted by the Commissioner and the State Board, and would not appear to offend educational policy.

In this case we are not called upon to decide what greater period of negotiated notice would not substantially interfere with the managerial prerogative. In *New Jersey State College Locals, supra,* we recognized that although *N.J.A.C.* 9:2–3.7 allowed the Board of Higher Education " 'at least two weeks' in which to give notice of proposed layoffs" and *N.J.A.C.* 9:2–3.8 "require[d] the Board to give layoff notices to individual employees 'as soon as possible,' " setting a longer period of time for giving notice of proposed action and layoffs remained "open for negotiation." 91 *N.J.* at 34. In evaluating such a procedure we would be guided by the dynamics of the budget-making process and the realization that these fiscal decisions may be forced upon a board of education by the necessity of circumstances. In the context of this case then, in which the parties have not actually negotiated a separate provision for notice of proposed fiscal layoffs,[3] the proper measure of damages would allow compensation, including health benefits and reemployment expenses, for the 61 days of late notice. (Although the costs of the employment search were disputed, in view of the pursuit of the mitigation issue before the arbitration by both parties, they are allowed). We are satisfied that the public interest will be served by modifying the arbitrator's award and allowing enforcement to this extent. The Chancery Division should enter judgment to confirm the award as modified to that extent.

---

[3]The provision upon which the arbitrator relied was the general contractual provision requiring the teacher to be notified by April 30 of teaching status for the ensuing year.

As modified, the judgment of the Appellate Division is affirmed. The cause is remanded to the Chancery Division for entry of an order conformable with this opinion.

*For modification and affirmance* —Justices CLIFFORD, HANDLER, POLLOCK, O'HERN and GARIBALDI—5.