780 A.2d 525 (2001)
169 N.J. 505
STATE of New Jersey, Department of Corrections, Plaintiff-Respondent,
v.
INTERNATIONAL FEDERATION OF PROFESSIONAL AND TECHNICAL ENGINEERS, LOCAL 195, Defendant-Appellant.
Supreme Court of New Jersey.
Argued February 13, 2001.
Decided July 12, 2001.
*527 Arnold Shep Cohen, Newark, argued the cause for appellant (Oxfeld Cohen, attorneys).
George N. Cohen, Deputy Attorney General, argued the cause for respondent (John J. Farmer, Jr., Attorney General of New Jersey, attorney; Mary C. Jacobson, Former Assistant Attorney General, of counsel).
Judiann Chartier, Highland Park, argued the cause for amicus curiae, Communications Workers of America, AFL-CIO (Weissman & Mintz, attorneys).
*526 The opinion of the Court was delivered by ZAZZALI, J.
In this matter an arbitrator awarded back pay to public-sector employees who were improperly denied overtime in violation of a collective negotiations agreement. The Appellate Division held that although the back pay award was explicitly authorized by the agreement, the award nevertheless violated the "no work, no pay" rule, a common law rule established in 1859, *528 which prohibits payment to individuals for services they did not perform.
This appeal poses the "provocative question[]... whether the `no work, no pay' rule retains its vitality." Heath v. Bd. of Managers, 92 N.J. 1, 6-7, 455 A.2d 77 (1983). We conclude that the "no work, no pay" rule is an anachronism in modern-day labor jurisprudence. We therefore abrogate that rule and reinstate the arbitration award in this case.

I
The collective negotiations agreement (Agreement) between the New Jersey Department of Corrections (DOC) and the International Federation Of Professional and Technical Engineers, Local 195 (Local 195 or Union), provides in pertinent part:

ARTICLE XII
OVERTIME
A. 1. Employees covered by this Contract will be compensated at the rate of time and one-half for overtime hours accrued in excess of the normal hours of the established work week. These compensation credits shall be taken in compensatory time or in cash.
....
B. 1. Overtime shall be scheduled and distributed by seniority on a rotational basis by occupational classifications within each functional work unit without discrimination provided it does not impair operations. Employees within their functional work unit who are qualified and capable of performing the work without additional training shall be called upon to perform such overtime work. To the extent that it is practical and reasonable to foresee, the State shall give the employee as much advance notice as possible relative to the scheduling of overtime work.
2. A list showing the rotational order and the overtime call status of each employee shall be maintained in the work unit. Such records shall be made available for inspection on request to Union Officers, Stewards and employees concerned.
On three occasions in 1997, the DOC assigned overtime to Ernie Guinta, a supervisor at a State correctional facility. Although Guinta's name appeared on the overtime rotation list, he should not have been included because he was not a member of the Local 195 bargaining unit. Because Guinta worked on those three occasions, the first member of the bargaining unit on the rotational list was not called for overtime. Local 195 filed a grievance for each incident, alleging that the DOC breached the Agreement's overtime provisions.
The parties submitted the grievances to arbitration. They stipulated that the sole issue was: "What is the contractual remedy in Article XII, Sections A, B, and C, [for] having a supervisor on the IFPTE, Local 195 overtime rotational list and ... call[ing him] from that list on March 28, 1997, May 4, 1997 and May 25, 1997?" Article VII, Section F, Subsection 5 of the Agreement establishes the boundaries for an arbitrator's determination. It provides in pertinent part:
c. The arbitrator shall not have the power to add to, subtract from, or modify the provisions of this Contract or laws of the State, or any policy of the State or subdivision thereof or to determine any dispute involving the exercise of a management function which is within the authority of the State as set forth in Article II, Management Rights, and shall confine his [or her] decision solely to the interpretation and application of this Contract.... The arbitrator may prescribe an appropriate back pay remedy *529 when he finds a violation of this Contract, provided such remedy is permitted by law and is consistent with the terms of this Contract. If the arbitrator renders a back pay award, then in accordance with State policy, appropriate benefits will be restored to the employee for the period of time covered by the back pay award.

[Emphasis added.]
The arbitrator found that the appropriate remedy for the contractual violation was to award back pay to the Local 195 members at the top of the overtime rotational list on the three dates in question. The arbitrator concluded:
Absent any limitations on my authority, I would direct the State to compensate the senior person who was on the occupational overtime list on the three dates at the overtime rate for the number of hours worked by Mr. Guinta. That would be the only way to make these employees whole for the contractual violation.... Here, because the overtime was worked by a person who was not in the bargaining unit, that work was lost by the bargaining unit. The three employees who should have been called cannot get back what they should have gotten by working other overtime because that overtime would have to come at the expense of other employees who were entitled to work it and therefore this would violate their contractual right to the overtime. Only by directing that the three be compensated for the overtime worked by Mr. Guinta can the contractual breach be remedied.
The arbitrator rejected the State's contention that the no work, no pay rule precluded an award of back pay to remedy the violation. He concluded that Communications Workers, Local 1087 v. Monmouth County Board of Social Services, 96 N.J. 442, 476 A.2d 777 (1984), did not compel that result because the Court in that case reached its conclusion based on the absence of contractual authority for an award of back pay, and explicitly refused to address whether the rule precluded such an award. The arbitrator reasoned that he had the authority to make a back pay award against the State:
In my view, given the overall purpose of the New Jersey Employer-Employee Relations Act in the prevention and prompt settlement of disputes, given the general negotiability of terms and conditions of employment including overtime, given the absence of statutory or regulatory constraints on the State regarding payment for overtime, given the fact that these parties have specifically agreed in their negotiated agreement that an arbitrator can award back pay for a contractual violation, and given the fact that such an award is the standard remedy in such cases, there is no public policy prohibition against an award of back pay in this case.
The Law Division vacated the arbitrator's award. The court concluded that Communications Workers, although not explicitly resting its holding on the no work, no pay rule, demonstrated that the rule still exists, and that the rule therefore prohibited the arbitrator's back pay award. The Appellate Division affirmed the judgment of the Law Division, reiterating that the no work, no pay rule controlled the case. The court noted that "[a]ccording to the agreement, a back pay remedy may only be awarded `provided such remedy is permitted by law,'"and that "[t]he arbitrator's authority was expressly circumscribed by the agreement by denying to the arbitrator the `power to add to, subtract from, or modify the ... laws of the State, or any policy of the State.'" The panel stated that "[i]n Communications *530 Workers, the court made it clear, even though the agreement did not provide for the remedy of back pay under the facts there presented, `that the public policy of not paying individuals for services they did not perform (the `no work-no pay' rule) is to be respected.'" (quoting Communications Workers, supra, 96 N.J. at 455, 476 A.2d 777). We granted certification, 165 N.J. 604, 762 A.2d 218 (2000).

II
"Arbitration is `a substitution, by consent of the parties, of another tribunal for the tribunal provided by the ordinary processes of law.'" Barcon Assocs., Inc. v. Tri-County Asphalt Corp., 86 N.J. 179, 187, 430 A.2d 214 (1981) (quoting E. Eng'g Co. v. Ocean City, 11 N.J. Misc. 508, 510-11, 167 A. 522 (Sup.Ct.1933)). The object of arbitration is "the final disposition, in a speedy, inexpensive, expeditious and perhaps less formal manner, of the controversial differences between the parties." Ibid. (quoting E. Eng'g Co., supra, 11 N.J. Misc. at 511, 167 A. 522). Because this Court views favorably the settlement of labor-management disputes through arbitration, County Coll. of Morris Staff Ass'n v. County Coll. of Morris, 100 N.J. 383, 390, 495 A.2d 865 (1985), the role of the courts in reviewing arbitration awards is extremely limited and an arbitrator's award is not to be set aside lightly. Kearny PBA Local # 21 v. Town of Kearny, 81 N.J. 208, 221, 405 A.2d 393 (1979). Generally, courts will accept an arbitrator's interpretation so long as the interpretation is "reasonably debatable." Old Bridge Bd. of Educ. v. Old Bridge Educ. Ass'n. (In re Old Bridge Bd. of Educ.), 98 N.J. 523, 527, 489 A.2d 159 (1985) (quoting Kearny, supra, 81 N.J. at 224, 405 A.2d 393). Federal labor jurisprudence, which we look to for guidance, Galloway Township Bd. of Educ. v. Galloway Township Ass'n of Educ. Secretaries, 78 N.J. 1, 10, 393 A.2d 207 (1978), explains the justification for that substantial deference:
Under well-established standards for the review of labor arbitration awards, a federal court may not overrule an arbitrator's decision simply because the court believes its own interpretation of the contract would be the better one. When the parties include an arbitration clause in their collective-bargaining agreement, they choose to have disputes concerning constructions of the contract resolved by an arbitrator. Unless the arbitral decision does not "dra[w] its essence from the collective bargaining agreement," a court is bound to enforce the award and is not entitled to review the merits of the contract dispute. This remains so even when the basis for the arbitrator's decision may be ambiguous.
[W.R. Grace & Co. v. Local Union 759, Int'l Union of the United Rubber, Cork, Linoleum and Plastic Workers, 461 U.S. 757, 764, 103 S.Ct. 2177, 2182, 76 L.Ed.2d 298, 306 (1983) (quoting United Steelworkers v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424, 1428 (1960)) (citations omitted).]
"Regardless of what [a court's] view might be of the correctness of [the arbitrator's] contractual interpretation, the Company and the Union bargained for that interpretation. A ... court may not second-guess it." Id. at 765, 103 S.Ct. at 2183, 76 L.Ed.2d at 306. Thus, if the arbitrator's contractual interpretation is "reasonably debatable," we must defer to that interpretation.
A court, however, may vacate an arbitration award in cases of corruption, fraud, "evident partiality," and "[w]here the arbitrators exceeded or so imperfectly executed their powers that a mutual, final and definite award upon the subject matter *531 submitted was not made." N.J.S.A. 2A:24-8. A court also may vacate an award if it is contrary to existing law or public policy. State, Office of Employee Relations v. Communications Workers, 154 N.J. 98, 112, 711 A.2d 300 (1998); South Plainfield Bd. of Educ. v. South Plainfield Educ. Ass'n ex rel. English, 320 N.J.Super. 281, 288, 727 A.2d 71 (App. Div.), certif. denied, 161 N.J. 332, 736 A.2d 525 (1999).
New Jersey courts have emphasized the importance of arbitration to public sector employees. See, e.g., Neptune City Bd. of Educ. v. Neptune City Educ. Ass'n, 153 N.J.Super. 406, 409, 379 A.2d 1281 (App. Div.1977). In Neptune, the court noted that arbitration
is clearly a matter of special imperative in labor disputes involving public employees from whom the right to strike has been withheld and for whom, accordingly, negotiation and arbitration constitute their primary recourse for the settlement of their disputes with management.
[Neptune, supra, 153 N.J.Super. at 409, 379 A.2d 1281.]

III
Both the trial court and the Appellate Division relied on Communications Workers, supra, 96 N.J. at 453-55, 476 A.2d 777, which discussed the no work, no pay rule in the context of an arbitration award. In Communications Workers, the Department of Civil Service announced a promotional examination for the position of an "income maintenance specialist" with the Monmouth County Welfare Board. Id. at 445, 476 A.2d 777. The job description stated that a bachelor's degree was a prerequisite, but the examination announcement did not include that requirement. Ibid. After several applicants who did not have degrees passed the test, the Board protested and the Department removed those names from the employment list. Ibid. The Civil Service Commission ruled on appeal that work experience satisfied that requirement, and ordered the Department to replace those names on the list. Id. at 446, 476 A.2d 777. The Appellate Division affirmed that determination. Ibid. The Department did not provide for a back-pay differential for the period between the actual promotion and the date that the candidates' names had first appeared on the list. Ibid. The employees subsequently demanded back pay, and their union submitted the claim to arbitration. Ibid. The arbitrator awarded back pay, but the Law Division vacated the award, applying the no work, no pay doctrine. Id. at 447, 476 A.2d 777. The Appellate Division reversed, holding that an "income maintenance specialist" was not a public "officer" for purposes of the no work, no pay doctrine. Id. at 448, 476 A.2d 777.
In Communications Workers, the Court applied a three-tiered analysis. The first question was whether the contract gave the arbitrator the authority to award the back-pay differential for failure to promote that the union sought in that case, in light of the principle that the arbitrator's authority to provide a particular remedy stems solely from the contract and the arbitrator cannot exceed that authority. Communications Workers, supra, 96 N.J. at 448, 476 A.2d 777. The second question, according to the Court, was whether the arbitrator's action conformed with applicable law. Id. at 450, 476 A.2d 777. The Court addressed that question in part because the contract explicitly provided that the arbitrator's remedy must be "permitted by law." Id. at 451, 476 A.2d 777. Finally, in the case of a public sector dispute, the Court noted that the arbitrator's *532 action must conform with principles of public policy. Id. at 450, 476 A.2d 777.
The arbitration clause in this case is substantively identical to the clause in Communications Workers. The clause provides, like the clause in Communications Workers, that "[t]he arbitrator shall not have the power to add to, subtract from, or modify the provisions of this Contract or laws of the State, or any policy of the State or sub-division thereof." The clause also provides, as in Communications Workers, that "[t]he arbitrator may prescribe an appropriate back pay remedy when he [or she] finds a violation of this Contract, provided such remedy is permitted by law and is consistent with the terms of this Contract." Based on the similarities of that language and the fact that the governing principles are the same, the three-tiered analysis the Court used in Communications Workers is appropriate in this case. We must consider, then,(1) whether the parties intended to give the arbitrator the authority to award back pay for a violation of the agreement's overtime provisions; (2) whether such an award is "permitted by law;" and (3) whether, because this case involves public employees, public policy precludes such an award.
In his decision, the arbitrator noted that the contract explicitly provides that the "arbitrator may prescribe an appropriate back pay remedy when he [or she] finds a violation of this contract." He also noted that the DOC "essentially conceded" that it violated the contract. Based on that explicit authorization, the arbitrator concluded that he had the contractual authority to award back pay in this matter. We must defer to that interpretation because it is, without a doubt, "reasonably debatable." Even if we could construct an alternate interpretation of the contractual language, we are without authority to do so. The parties bargained for the arbitrator's contractual interpretation, and we cannot upset that legitimate interpretation based on our own interpretation. Although we defer to the arbitrator's conclusion, we also note that, on the merits, we agree with his conclusion and find that the contract authorized an award of back pay as a remedy for a contract violation.
The dissent contends that Communications Workers demonstrates that the arbitrator incorrectly interpreted the contract. However, as we have discussed, we must defer to the arbitrator's contractual interpretation, but even in the absence of that deference, we would agree with that interpretation. Moreover, in Communications Workers, the contract did not allow for an award of back pay; as we have discussed, the contract here has no such infirmity.
In Communications Workers, the employees sought a back pay differential for the period between the date they were improperly removed from a promotional list and the date they actually received the promotions. The agreement provided that "[a]ny employee who is promoted ... to another title with a higher salary range shall have his [or her] ... salary adjusted so that it provides an increase in pay of one increment of the present salary range plus the amount (if necessary) to adjust and equalize the employee's salary to the proper step of the new salary range." Id. at 451-52, 476 A.2d 777. The agreement also provided that "[t]he arbitrator shall not have the power to add to, subtract from, or modify the provisions of this Agreement," id. at 449, 476 A.2d 777, and
that the arbitrator may "prescribe an appropriate back pay remedy" only when there is a violation of the agreement, and "provided such remedy is permitted by law and is consistent with the terms of [the] Agreement, except that [he or she] may not make an award *533 which exceeds the Welfare Board's authority."

[Id. at 451, 476 A.2d 777.]
The Court concluded that "[t]he terms of the negotiated agreement [did] not expressly provide for back pay for failure to promote." Id. at 451, 476 A.2d 777. Because the agreement stated that "[a]ny employee who is promoted" was entitled to a salary increase, the agreement there "provide[d] by its terms for an increase in salary only from the date that an employee is actually promoted." Id. at 451-52, 476 A.2d 777 (emphasis added). Thus, the plain language of the contract precluded an award of a back-pay differential for the period prior to the date of actual promotion. Because the award was contrary to that language, and because "there was no evidence that when the contract was made, the parties intended that back pay should be awarded for ... failure to promote," the Court concluded that "the arbitrator had no authority under the negotiated agreement to award back pay under th[o]se circumstances." Id. at 452, 476 A.2d 777. The award to that effect was therefore an improper expansion of the agreement, contrary to the provision that denied the arbitrator that authority. Although there is some equivocal language in Communications Workers, a fair reading of that opinion reveals that the interdiction against back pay flowed not from the absence of a specific statement of remedy available for each and every breach, but from a contract provision that specifically prohibited back pay in the circumstances presented.
As we have noted, the arbitration clause in this case is substantively identical to the clause in Communications Workers. With regard to overtime, however, section A.1. of Article XII, entitled "OVERTIME," provides that "[e]mployees covered by this Contract will be compensated at the rate of time and one-half for overtime hours accrued in excess of the normal hours of the established work week. These compensation credits shall be taken in compensatory time or in cash." The contract thus provides that employees are entitled to "credits" for overtime hours "accrued." Unlike the agreement in Communications Workers, the agreement in this case contemplates an award of back pay as a remedy for a violation of the contractual provision regarding overtime. In Communications Workers, the explicit language of the agreement provided for payment of increased salary after a promotion starting from the date of actual promotion. An award of back pay for the period before the actual promotion was not contemplated by the parties. However, in this case, the agreement provides that employees will be compensated for "overtime hours accrued." "Accrue" means "to increase; to augment; to come to by way of increase; to be added as an increase.... Acquired; ... received...." Black's Law Dictionary 20 (6th ed.1990); Webster's Third New International Dictionary 13 (1971) (defining "accrue" to mean "to come by way of increase or addition ... to be periodically accumulated in the process of time.... Gather, collect, accumulate."). "Accrue" does not necessarily mean that the time must be "worked." Instead, "accrue" only speaks to the fact that the hours are collected, not to the manner in which the employee becomes entitled to those hours. That understanding is further supported by the fact that the agreement refers to the "overtime hours accrued" as "compensation credits." Simply put, the agreement provides that "[e]mployees... will be compensated at the rate of time and one-half for overtime hours accrued in excess of the normal hours of the established work week;" it does not provide that "[e]mployees ... will be compensated at the rate of time and *534 one-half for overtime hours worked in excess of the normal hours of the established work week." Had the parties intended to use the term "worked," they certainly could have, as they did three subsections below when referring to "[h]ours worked on a holiday." That choice of language demonstrates that the parties did not intend to preclude back pay awards for overtime violations by imposing a prerequisite of actual work under the overtime provisions. As a result, the arbitrator's back pay award was entirely "consistent with the terms of th[e] Contract" in this case, as the contract requires.
The dissent states that the contracting parties must "tie the provision of back pay as a remedy to a specific violation." Ante at 545, 780 A.2d at 550. The dissent's approach, however, does violence to the deference we must show to the arbitrator's contractual interpretation. If that interpretation is "reasonably debatable," as it is, we cannot brush it aside and substitute our own interpretation as the dissent would. The award is entitled to deference.
In any event, the dissent's proposed interpretation of the agreement is flawed. The agreement here specifically provides that the arbitrator "may prescribe an appropriate back pay remedy" for a contract violation. Presumably, then, the dissent would require the parties to enumerate, in the agreement, all of the possible contractual violations that may occur and whether those violations can be compensated by an award of back pay. The dissent points to no precedent that supports that requirement. Certainly, there is no legal prohibition on contracting parties agreeing that a back pay remedy is available for any and all contractual violations, and, conversely, no requirement that parties specify every possible contract violation and state that each of them may entitle an aggrieved party to an award of back pay. The dissent's requirement that the power to award back pay be conditioned on an itemization of the contract violations subject to back pay is simply unrealistic. It would be virtually impossible to list every possible violation that is arguably subject to a back pay remedy. Yet that is what the dissent suggests. It is said that, because the contract does not provide for back pay as a remedy for lost overtime opportunity, the arbitrator has no power to award such back pay since there is "nothing to indicate that that is what the parties intended." Ante at 545, 780 A.2d at 550. That is precisely what the parties intended when they agreed that the arbitrator "may prescribe an appropriate back pay remedy when he [or she] finds a violation of this Contract." That is more than sufficient.
As noted, federal labor jurisprudence provides valuable guidance for our own labor jurisprudence. Galloway, supra, 78 N.J. at 10, 393 A.2d 207. With that in mind, we note that the United States Supreme Court has addressed the need for a flexible approach to an arbitrator's authority with regard to remedies:
When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to formulating remedies. There the need is for flexibility in meeting a wide variety of situations. The draftsmen may never have thought of what specific remedy should be awarded to meet a particular contingency.

[Steelworkers, supra, 363 U.S. at 597, 80 S.Ct. at 1361, 4 L.Ed.2d at 1428 (emphasis added).]
Communications Workers, supra, 96 N.J. at 449, 476 A.2d 777, cites one of *535 the classic texts on arbitration, Elkouri & Elkouri, How Arbitration Works (Marlin M. Volz & Edward P. Goggin eds., 5th ed.1985), also relevant here. Under the section entitled "Principles of Damages," Elkouri also states:
In empowering the arbitrator to resolve their dispute, the parties generally are considered to have given authority to grant adequate monetary relief where the arbitrator finds that the grievance has merit. Arbitrators are considered to have the authority to award monetary damages for contract violations even though the contract does not specifically provide such remedy, since the parties have empowered the arbitrator to resolve their dispute. In this regard, Arbitrator [and former United States Secretary of Labor] W. Willard Wirtz emphasized that arbitrators have authority to award money damages for contract violations even though the contract does not specifically provide such remedy. To restrict arbitrators to remedies specifically set forth in the contract would negate arbitration as a method of dispute settlement or would result in cluttering contracts with numerous liquidated damages provisions that would invite more trouble than they could prevent.
[Id. at 579-80 (footnotes omitted) (emphasis added).]
Another recognized treatise, Fairweather's Practice and Procedure in Labor Arbitration (Ray J. Schoonhoven ed., 4th ed.1999), opens the discussion on "Back-Pay Awards" with the observation that "[e]ven in the absence of specific contractual authority, arbitrators have the power to decide whether back pay should be awarded to remedy the wrong." Id. at 458, 476 A.2d 777. Former Solicitor General Archibald Cox, when serving as a labor arbitrator, succinctly set forth the philosophy undergirding back pay:
When the employer causes the loss, however innocently, it is more just that he should bear the cost of making the employee whole than that the employee should be forced to suffer a denial of contract rights without a remedy.
[Electric Storage Battery Co., AAA Case No. 19-22 (1960) (Cox, Arb.).]
The dissent correctly notes that the arbitrator's authority to resolve a dispute depends on whether the parties have delegated that power to him or her. Ante at 543, 780 A.2d at 549. Clearly, in this case they have. The contract says that the arbitrator "may prescribe an appropriate back pay remedy when he [or she] finds a violation of this Contract." In sum, our precedent, federal labor jurisprudence, and the works of learned commentators make clear that the agreement in this case authorizes an award of back pay in this appeal. Moreover, although we need not reach the question, the commentators suggest that the award may have been permissible even without that contractual authorization.
Because the arbitrator's interpretation was reasonably debatable, we therefore must proceed to the second tier of the Communications Workers analysis, and determine whether the arbitrator reasonably concluded that the back pay award in this case is "permitted by law." The dissent concludes that an award of back pay for a specific contract violation is only "permitted by law" if there is a statute or regulation that specifically provides for a back pay award in that particular situation. Because there is no statute or regulation specifically authorizing an arbitrator to award back pay as a remedy for a contractual violation of an overtime provision, the dissent concludes that such an *536 award is not "permitted by law." The dissent errs for two reasons.
First, the phrase "permitted by law" means that the award cannot be prohibited by law. If there was a statute or regulation that prohibited a back pay award against the Department of Corrections for the DOC's violation of an overtime provision, the parties did not intend the arbitrator to have the authority to make such an award because it is not "permitted by law." That phrase does not mean, as the dissent would interpret it, that the award must be explicitly authorized by statute or regulation. That interpretation is not faithful to the parties' intent, which is best evidenced by the language of the contract. Had the parties intended that result to obtain, they would have used the phrase "authorized by law." At the very least, that contractual interpretation of the phrase "permitted by law," implicitly reached by the arbitrator, is "reasonably debatable" and is therefore entitled to deference.
In Communications Workers, we addressed a substantively identical "permitted by law" provision. That provision made "clear that the terms of the negotiated agreement and the dictates of the law set specific boundaries on the arbitrator's substantive authority to make back-pay awards." Communications Workers, supra, 96 N.J. at 451, 476 A.2d 777. That description demonstrates that the language "permitted by law" does not require, contrary to the dissent's suggestion, explicit statutory or regulatory authorization for particular remedies. Instead, that language merely "set[s] specific boundaries" on the arbitrator's contractually-based authority to make back pay awards.
Second, even if "permitted by law" required that the DOC have statutory or regulatory authorization to agree to a back pay award, there is such authorization. The Commissioner of the Department of Corrections has the authority to "[a]ppoint and remove officers and other personnel employed within the department, subject to the provisions of [the Civil Service Act]." N.J.S.A. 30:1B-6b. Public employees, such as those employed by the Department of Corrections, have a constitutional right to organize and bargain collectively. N.J. Const. art. I, ¶ 19; Council of New Jersey State College Locals v. State Bd. of Higher Educ., 91 N.J. 18, 25, 449 A.2d 1244 (1982). Thus, the State Constitution compels the conclusion that implicit in the statutory grant of authority to the Commissioner of the DOC is the authority to engage in collective negotiations and enter into a collective negotiations agreement with DOC employees. Any other conclusion would violate DOC employees' constitutional right to bargain collectively. Subsumed within that statutory grant is the authority to agree to contractual terms and conditions as the DOC sees fit, including, if desired, back pay as a remedy for a contract violation.
Further, N.J.S.A. 34:13A-5.3 explicitly provides that "[p]ublic employers shall negotiate written policies setting forth grievance and disciplinary review procedures." Those grievance procedures "shall" be included in the collective agreement. Ibid. Indeed, those procedures "may provide for binding arbitration as a means for resolving disputes." Ibid. The natural corollary of all of those rights is that there must be remedies. Just as the legislation specifically authorized the above explicit procedures, it follows that the Legislature must have intended remedies for violations of those rights. Any other interpretation is blatantly contrary to that intent. Stated differently, implicit in that statutory requirement is that public employers, such as the DOC, have the grant of authority to negotiate those procedures. *537 It is unrealistic and contrary to the legislative intent to require more than that, i.e., that there must be a specific statute or regulation authorizing every circumstance in which the State may choose to agree to back pay awards. Those statutes, at the very least, give implicit authority to the DOC to agree to an award of back pay as a remedy for a violation of an overtime provision.
In that regard, City of Camden v. Dicks, 135 N.J.Super. 559, 343 A.2d 808 (Law Div.1975), is instructive. In that case, Camden entered into a collective bargaining agreement with the negotiations representative for a group of city employees. Id. at 560, 343 A.2d 808. One of the terms of that agreement was that "[u]pon retirement from service to the City of Camden... the employee shall receive fifty percent (50%) of his accumulated sick time as additional severance pay said payment not to exceed $12,000.00" Ibid. After the defendant retired, the City paid her $4,614.52, representing 50% of her accumulated sick time. Ibid. The City later filed suit against the defendant to recover the money. Ibid.
Before the trial court, Camden contended that its agreement to that particular provision was outside of its authority, and that it was therefore void. Ibid. The court first noted that neither the Faulkner Act nor the Civil Service Act prohibited Camden from agreeing to such a term. Id. at 561, 343 A.2d 808. Camden nonetheless contended "that since there is no express authority in either of the statutes to compensate retiring employees by way of percentage of unused accumulated sick leave time, that to contract as it did constituted an ultra vires act." Id. at 561-62, 343 A.2d 808. The court determined that the Faulkner Act and the Civil Service Act provided sufficient statutory authority for a municipality to pay for unused sick leave as additional compensation upon retirement. Id. at 562, 343 A.2d 808. The court concluded:
The Legislature in no place has withdrawn from a municipality the power to pay for unused sick leave. In the absence of express restriction against bargaining for that term of an employment contract between an employer and its employees, the authority to provide for such payment resides in the municipality under the broad powers and duties delegated by the statutes. Were it otherwise a municipality would not be able to bargain collectively and to make agreements concerning terms of employment with its employees unless specific statutory authority for each provision of the agreement existed. Such a narrow and inflexible construction would virtually destroy the bargaining powers which public policy has installed in the field of public employment and throttle the ability of a municipality to meet the changing needs of employer-employee relations. Such a construction would undermine the laudable purposes of New Jersey Employer-Employee Relations Act.

[Id. at 562-63, 343 A.2d 808 (citations omitted).]
Those principles apply with equal force to this case. In the absence of a statute or regulation precluding a public employer from agreeing to a particular type of provision, the employer's general grant of authority, by statute, provides the authority to agree to those provisions. Any other "narrow and inflexible construction would virtually destroy the bargaining powers which public policy has installed in the field of public employment and throttle the ability of a municipality to meet the changing needs of employer-employee relations," as well as "undermine the laudable purposes of New Jersey Employer Employee Relations Act." Ibid.
*538 We cannot expect the legislative and executive branches to specifically authorize every possible provision that the State and a collective representative may consider agreeing to in a collective negotiations agreement. The agreement in this case is fifty-one single-spaced pages, containing dozens of provisions. Requiring the Legislature or Executive to specifically authorize each and every one of those provisions in order for an arbitrator to give force to those provisions would pose a virtually insurmountable burden on those branches of government. We know of no prior decision, and the dissent points to none, in which we have analyzed a collective negotiations agreement to determine whether the provision sought to be enforced was specifically authorized, in particular detail, by the Legislature or Executive. Cf. In re Hunterdon County Bd. of Chosen Freeholders, 116 N.J. 322, 330, 561 A.2d 597 (1989) (noting, during preemption analysis, that "[t]he issue, however, is not whether [three statutes] authorize the County to adopt a safety-incentive program, but whether they exempt the County from negotiating with the Union over any of its provisions"). Therefore, we conclude that there is no need for specific statutory authorization for every possible item to which the public employer and the bargaining unit may agree.
The above analysis of the contract language would normally be for the arbitrator, not for the court. This appeal, and those issues in particular, provides a hornbook example of the need for courts to exercise restraint in reviewing arbitration awards. We should beware of the "hazard of going further into the merits." Steelworkers, supra, 363 U.S. at 572, 80 S.Ct. at 1365, 4 L.Ed.2d at 1434 (Brennan, J., concurring). We engage in this discussion, which is a traditional arbitral function, only because the dissent raises the issue and we should put it to rest. It is one thing for the Court to make reasonably certain that the State's legitimate intents are protected; it is something else again to micro-manage a contract.
As a result of that conclusion, we now turn to the core question in this appeal: the continuing validity of the no work, no pay rule.

IV
The seminal case of City of Hoboken v. Gear, 27 N.J.L. 265, 1859 WL 5692 (Sup. Ct.1859), created the no work, no pay rule almost a century and a half ago. In that case, the plaintiff was appointed a policeman for a two-year term. He served in that capacity for seven months, until the city disbanded the police department, and his position. The plaintiff filed suit, alleging that he was entitled to wages for the full two-year term. The court framed the question as follows:
[W]hether ... the appointment of an officer of a municipal corporation, with a fixed salary for a definite term of office, operates as a contract between the public and the individual, whereby they are bound to pay that salary during the term for which he is appointed, or so long as he continues de jure in office.

[Id. at 275.]
The court noted that in a private contract both parties must agree to be bound, neither can unilaterally alter the terms of the contract, and each is liable to the other for breach of the contract. Id. at 277. In the context of an appointment, however, the appointee to public office does not have to agree voluntarily to the appointment and either the appointee or the government entity can alter or terminate the appointment at any time without penalty. Id. at 277-78. Based on those distinctions, the court concluded that the plaintiff's appointment as a police officer did not give him an *539 enforceable contract right that would allow him to collect the salary for the full term. Id. at 278. Because there was no contract, the plaintiff did not have a property interest in the office for purposes of the constitutional prohibition against impairing an obligation of contract. Ibid. In that context, the court referenced a New York decision that held:
[T]he prospective salary or other emoluments of a public officer are not the property of the officer nor the property of the state. They are not property at all. They are like daily wages unearned, and which may never be earned. The incumbent may die or resign, and his place be filled and the wages earned by another. The right to the compensation grows out of the rendition of the services, and not out of any contract between the government and the officer that the services shall be rendered by him.
[Id. at 279 (citing Conner v. Mayor of New York, 5 N.Y. 285, 1 Selden 285, 1851 WL 5494 (1851)).]
The court also observed that principles of public policy prohibited the action because the public entity would have been forced to pay for the services twice, once to the appointed officer and once to the officer who actually performed the services. Id. at 280. Moreover, that recovery "would supply an ingenious device by which both candidates, if they could not enjoy the honor, might at least reap the emoluments of the office." Ibid. Thus, City of Hoboken stood for three propositions: (1) a governmental entity's appointment of a "public officer" does not create a contract-type right enforceable by the officer against the entity; (2) because the contract does not exist, the officer has no property interest in the position; and (3) there is a policy against the State paying for services it does not receive.
The Court of Errors and Appeals adopted City of Hoboken's rationale in Stuhr v. Curran, 44 N.J.L. 181, 1882 WL 8322 (E. & A. 1882). In that case, the plaintiff and the defendant were opposing candidates for Freeholder in Hudson County. The board of canvassers declared that the defendant won the election, and he performed the duties of the office for six months. He was subsequently ousted from office by the plaintiff, the rightfully-elected candidate, in a quo warranto action. The plaintiff then instituted an action against the defendant to recover the salary received by the defendant while he was in possession of the office. The court noted:
In this country [public offices] are not held by grant or contract, nor has any individual a property or vested right in them beyond the constitutional tenure and compensation.... The right to the fees or compensation does not grow out of any contract between the government and the officer, but arises from the rendition of the services.

[Id. at 188-89.]
Thus, the Court adopted City of Hoboken's conclusion that a public officer had no property or contractual right to an appointment, and therefore was entitled only to compensation for work performed. That rule became well entrenched in the common law of New Jersey throughout the thirty years following City of Hoboken. See, e.g., Bennett v. City of Orange, 69 N.J.L. 176, 177-78, 54 A. 249 (Sup.Ct.), aff'd, 69 N.J.L. 675, 56 A. 1131 (E. & A.1903); Uffert v. Voght, 65 N.J.L. 377, 381, 47 A. 225 (Sup.Ct.1900), aff'd, 65 N.J.L. 621, 48 A. 574 (E. & A.1901); State ex rel. Kenny v. Hudspeth, 59 N.J.L. 320, 322, 36 A. 662 (Sup.Ct.1896), aff'd, 59 N.J.L. 504, 37 A. 67 (E. & A. 1897); State ex rel. Bumstead v. Govern, 47 N.J.L. 368, 375, 1 A. 835 (Sup.Ct.1885), aff'd, 48 N.J.L. *540 612, 9 A. 577 (E. & A. 1886); Meehan v. Bd. of Chosen Freeholders, 46 N.J.L. 276, 280, 1884 WL 7655 (Sup.Ct.1884); Greene v. Bd. of Chosen Freeholders, 44 N.J.L. 388, 391, 1882 WL 8528 (Sup.Ct. 1882); Burlington v. Estlow, 43 N.J.L. 13, 14-15, 1881 WL 8512 (Sup.Ct.1881); State ex rel. Rutgers v. Mayor of New Brunswick, 42 N.J.L. 51, 52-53, 1880 WL 7702 (Sup.Ct.1880); Love v. Mayor of Jersey City, 40 N.J.L. 456, 459, 1878 WL 8331 (Sup.Ct.1878); Butcher v. City of Camden, 29 N.J. Eq. 478, 481, 1878 WL 8167 (Ch. 1878).
The Court of Errors and Appeals described the distinction between public officers and public employees in Ross v. Board of Chosen Freeholders, 90 N.J.L. 522, 102 A. 397 (E. & A.1917). In Ross, the sheriff of Hudson County appointed the plaintiff as a guard in the Hudson County Jail. Id. at 526, 102 A. 397. The sheriff dismissed him illegally, and the plaintiff appealed to the state civil service commission, which ordered him reinstated. Id. at 522, 102 A. 397. The plaintiff reported to work regularly for over one year, but the sheriff prevented him from rendering any services. Id. at 523, 102 A. 397. The lower court concluded that the plaintiff held a "position," and therefore could not recover under City of Hoboken and Stuhr. Id. at 524-25, 102 A. 397.
The Court of Errors and Appeals observed:
Every person engaged in the civil service is either part of a governmental system or ... is employed to forward the work of such system; if the former, he [or she] is an officer to whom the doctrine of [City of Hoboken ] applies; if the latter, he [or she] is an employe to whom such doctrine does not apply.

[Id. at 525, 102 A. 397.]
According to the court, one of the "fundamental differences" between those two categories was that to an officer, "all idea of a contract is excluded, whereas an employment... connotes in some form the contractual relation of master and servant." Id. at 526, 102 A. 397. The test to determine to which class a person belongs "is whether the relation of the parties is in legal contemplation that of master and servant; if it is, the doctrine peculiar to offices cannot be applied to it." Ibid. The court reviewed prior decisions that held that the relationship between a guard and a county jail is one of master and servant, and concluded that the plaintiff was an employee. As such, he had a contractual right to the employment and City of Hoboken did not preclude his recovery of back pay. Ibid.
A year after Ross, World War I came to a close. Its end was the harbinger of the return of the nation to domestic concerns. Reform was the byword in legislative halls, particularly in respect of the Civil Service and the fundamental rights of workers. In New Jersey, our Legislature recognized the unfairness inherent in the no work, no pay rule, namely, that a person could be illegally dismissed, win reinstatement, and still not recover back pay. See Mason v. Civil Serv. Comm'n, 51 N.J. 115, 122-24, 238 A.2d 161 (1968) (describing legislative reaction to the no work, no pay rule). Accordingly, in response, the Legislature enacted L. 1918, c. 139, which read:
Whenever any municipal officer or employee shall have been illegally dismissed from such office or employment and the said dismissal shall have been set aside as illegal by a court of competent jurisdiction, such officer or employee shall be entitled to recover the salary of such office or employment for the period covered by such illegal dismissal.
The legislative history of that bill signaled an intent to mitigate the harshness of the no work, no pay rule:

*541 This is a bill to protect the employees and officers of municipalities who may be illegally dismissed from their employment. It is now possible under the law to illegally dismiss a man, and when the dismissal is set aside as illegal, it may happen in many instances that the individual cannot recover the salary that is rightfully his because of the law and the decision of this State. In a word, the Civil Service Law does not give the protection that it ought to give. This Bill would remedy that evil and would protect the individual.
[Mason, supra, 51 N.J. at 122-23, 238 A.2d 161 (quoting Statement to Assembly Bill No. 231 (1918)) (emphasis added).]
That ameliorative principle, after several legislative revisions, Mason, supra, 51 N.J. at 120-24, 238 A.2d 161, was enacted in three separate statutes: N.J.S.A. 40A:9-172; N.J.S.A. 40A:14-23; and N.J.S.A. 40A:14-151. The first of those statutes provides that a municipal officer or employee is entitled to backpay if he or she is illegally "suspended or dismissed." N.J.S.A. 40A:9-172. The other two statutes provide essentially the same entitlement, but to firefighters and police officers, respectively. N.J.S.A. 40A:14-23 (firefighters); N.J.S.A. 40A:14-151 (police officers).
"[T]he legislative purpose sought to be achieved by these enactments was to change the harsh rule of the common law which had denied recovery to blameless municipal officials who had been improperly suspended or dismissed from office." Township of Springfield v. Pedersen, 73 N.J. 1, 7, 372 A.2d 286 (1977) (emphasis added); accord Note, The Right of New Jersey's Governmental Officers and Employees to Recover for Back Pay When Illegally Dismissed or Suspended, 15 Rutgers L.Rev. 516 (1961) [hereinafter Governmental Officers]. Despite that broad indication of our Legislature's disapproval of the common law rule, courts followed the maxim that statutes in derogation of the common law must be strictly construed. See, e.g., Hart v. Borough of Hawthorne, 120 N.J.L. 27, 30, 197 A. 891 (Sup.Ct.), aff'd, 121 N.J.L. 135, 1 A.2d 416 (E. & A.1938); Strohmeyer v. Borough of Little Ferry, 136 N.J.L. 485, 56 A.2d 885 (E. & A.1948); Governmental Officers, supra, 15 Rutgers L.Rev. at 523. Strict construction often defeated the legislative intent underlying those statutes.
In DeMarco v. Board of Chosen Freeholders, 21 N.J. 136, 121 A.2d 396 (1956), for example, a county detective had been indicted on a charge of wilfully neglecting to perform his duties. Id. at 139, 121 A.2d 396. He was suspended from his position, but the indictment was dismissed before trial. Ibid. After he was reinstated, the plaintiff brought an action to recover his salary for the period during which he was under suspension. Id. at 139-40, 121 A.2d 396. The Court noted that the no work, no pay rule was firmly established in the common law of New Jersey. Id. at 140-41, 121 A.2d 396. The Court then addressed whether the plaintiff fell within the then-applicable statute, N.J.S.A. 40A:46-34. At the time, that statute applied to "municipal officer[s] or employee[s]." DeMarco, supra, 21 N.J. at 142, 121 A.2d 396 (quoting R.S. 40:46-34). The Court noted that to "view [the statute] as applicable to a county detective would be to enlarge its language in disregard of the rule of strict construction." Id. at 145, 121 A.2d 396. Thus, the Court concluded that the statute applied only to municipal officers and employees, and did not apply to a county detective.
The Legislature, on one occasion, has rejected that rule of strict statutory construction. In Strohmeyer, the Court of *542 Errors and Appeals held that a plaintiff who had been illegally suspended could not recover back pay under the statute because the plain language of the statute spoke only to illegal dismissals. Strohmeyer, supra, 136 N.J.L. at 485-86, 56 A.2d 885. The Legislature, in an emphatic indication of intent, amended the statute three weeks later to apply to illegal suspensions as well as dismissals. L. 1948, c. 395. The statement annexed to the bill stated:
The present law is R.S. 40:46-34. It only applied to persons illegally dismissed. Recently the Court of Errors and Appeals in the case of Strohmeyer v. Little Ferry held that a police officer illegally suspended could not recover his salary during the period of the suspension because the present law was not broad enough. The courts differentiate between `dismissal' and a `suspension.' The present act grants relief to any officer or municipal employee who has been illegally suspended.

[Statement to Assembly Bill No. 229 (1948).]
Strohmeyer filed another action, and he recovered back pay based on the statutory amendment. Strohmeyer v. Borough of Little Ferry, 6 N.J.Super. 282, 71 A.2d 141 (App.Div.1950).
We also discussed in DeMarco the policy concerns underlying the no work, no pay rule. We noted that the Legislature if it chose, could enact legislation that
in clear and direct terms constitutionally allow[s] compensation to all law enforcement officers (state, county and municipal) who are suspended pending trial on an indictment for misconduct in office and are later acquitted or otherwise vindicated. While such legislation would tend to satisfy the individual interests involved it would admittedly do so by placing upon the public the burden of expenditures for salaries without corresponding services. If other officers are appointed during the period of suspension duality of payments may result and if the suspended officers engage in private work during their suspensions they may be enabled to receive double compensation.

[Id. at 143, 121 A.2d 396 (citation omitted).]
Thus, two policy justifications evolved for the no work, no pay rule. First, the rule sought to protect the public entity from paying for services it did not receive, such that the entity would not have to pay twice for the same services. Second, the rule sought to prevent a windfall to the officer or employee who works elsewhere during the period of the suspension, earning double compensation. Those policies have undergirded the rule since its inception. City of Hoboken, supra, 27 N.J.L. at 280.

IV

A
We must first determine the precedential effect of Communications Workers, specifically whether that decision stands for the proposition that the no work, no pay policy precludes an arbitrator's award of back pay for a contract violation. In Communications Workers, as discussed, the Court held that the arbitrator misinterpreted the contract, and that the employees were not entitled to back pay under the contract's terms. Id. at 451-53, 476 A.2d 777. The Court also discussed the arbitrator's responsibility to resolve the dispute in accordance with New Jersey law and public policy. Id. at 450-51, 476 A.2d 777. "The civil service laws explicitly provide for retroactive pay only in situations involving suspensions, fines, removals, and demotions, and not in situations involving removal from a promotion *543 eligibility list or failure to promote." Id. at 455, 476 A.2d 777. The Court continued:
A possible implication of these statutory provisions is that the Legislature intended that employees were not to receive retroactive pay for an employer's failure to promote or for removal of names from a promotion eligibility list, and that the public policy of not paying individuals for services they did not perform (the "no work-no pay" rule) is to be respected in that situation. If that were the public policy, the parties could not lawfully contract or authorize an arbitrator to decide otherwise.... However, we need not decide whether the arbitrator's award was contrary to public policy because, in any event, the award exceeded the authority vested in the arbitrator by the negotiated agreement.

[Id. at 455, 476 A.2d 777.]
In Communications Workers, the Court merely recognized the existence of the no work, no pay doctrine. It did not decide whether the public policy underlying the doctrine precluded recovery of back pay because the contract did not provide for that recovery. Although the Court in dictum mentioned the no work, no pay rule, the Court did not place its imprimatur on the continuing validity of the rule. That issue is thus ripe for our consideration.

B
Despite staunch adherence to the rule of law and concomitant principles of stare decisis, this Court must not abdicate its responsibility to reevaluate the rules of the common law to determine if those rules remain in consonance with society's needs. The fundamental precept of New Jersey's common law is that it can, and must, change when change is appropriate. "It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past." Oliver Wendell Holmes, Jr., The Path of the Law, 10 Harv. L.Rev. 457, 469 (1897). In other words:
The doctrine of stare decisis neither renders the courts impotent to correct their past errors nor requires them to adhere blindly to rules that have lost their reason for being. The common law would be sapped of its life blood if stare decisis were to become a god instead of a guide. The doctrine when properly applied operates only to control change, not to prevent it.
[Fox v. Snow, 6 N.J. 12, 23, 76 A.2d 877 (1950) (Vanderbilt, C.J., dissenting).]
With that responsibility in mind, we conclude that the no work, no pay rule is an outdated and outmoded anachronism in modern-day labor jurisprudence.
To begin with, the original rationale behind the no work, no pay rule is inapposite in this case, as well as in the vast majority of labor cases involving public employees. City of Hoboken addressed whether, in the absence of a contract, an appointment to a public office gave the appointee any enforceable, contract rights against the governmental entity. City of Hoboken, supra, 27 N.J.L. at 277. The former Supreme Court reasoned that the appointment did not convey such rights because there was no bargained-for exchange, each party could terminate the arrangement unilaterally, and the appointee did not have to voluntarily agree to the arrangement. Because of those factors, the appointee had no contractual rights based upon the appointment. In this case, the employees entered into a contract with the public entity. Thus, there is no need to reach the *544 question addressed by City of Hoboken, which is whether, in the absence of a contract, the appointment confers contract-type rights on the appointee.
Not only is the rule largely irrelevant, it is unworkable in application. As it stands, the rule distinguishes between "officers," holders of a "position," and "employees." In what appears to be the most clear exposition on the issue, the Court of Errors and Appeals in Ross explained that the test to determine to which class a person belongs "is whether the relation of the parties is in legal contemplation that of master and servant; if it is, the doctrine peculiar to offices cannot be applied to it." Ross, supra, 90 N.J.L. at 526, 102 A. 397. Although that test may appear analytically straightforward, application has proven otherwise. Subsequent decisions "have drawn somewhat obscure and rather unfortunate lines between offices, positions and employments." Miele v. McGuire, 31 N.J. 339, 347, 157 A.2d 306 (1960). "[T]he legal tests for determining the status of the plaintiff in a particular case `are, to put it mildly, hard to apply.'" Governmental Officers, supra, 15 Rutgers L.Rev. at 518 (quoting Glasser, A New Jersey Municipal Law Mystery: What Is A "Public Office?", 6 Rutgers L.Rev. 503 (1952)). Moreover, because of the difficulty of application, the rule has been applied to a class of cases well beyond the original intent of the rule. "[C]ourts have conferred officer status on such `governmental' posts as municipal water purveyor ... and secretary to a local health board, while `official' status has been denied to an assistant city counsel." Governmental Officers, supra, 15 Rutgers L.Rev. at 518-19 (footnotes omitted).
The advent of employment contracts between public employees and the public entities for whom they work highlights another analytical flaw inherent in the no work, no pay rule. If the distinction is essentially between those who act as the government and those who work for the government, as Ross suggests, it defies logic that those who act as the government can enter into an employment contract with the government. In effect, it is as though the rule treats the "officer" with an employment contract as if he or she has entered into a contract with himself or herself. Such a conclusion is unsound.
Ross evinces a judicial attempt to mitigate the harshness of the rule. The Legislature also sought to achieve that goal on several occasions by legislation intended to eliminate the injustice of the no work, no pay rule. Mason, supra, 51 N.J. at 122-23, 238 A.2d 161. Courts subverted that unequivocal intent by employing a strict construction of the statutory scheme. The legislative reaction to Strohmeyer demonstrates a legislative discomfort, in the context of that case, of the holding that a statute intended to ameliorate the no work, no pay rule must be strictly construed. The legislative intent discussed in Mason, as well as the intent evinced in the wake of Strohmeyer, indicate strong legislative disapproval of both the no work, no pay rule itself and a rule of strict statutory construction applied to enactments designed to limit that rule.
The Legislature also has approved, on numerous occasions, an award of back pay as a remedy for conduct in violation of a statute or contract. Those include the statutes, discussed above, enacted to eliminate the no work, no pay rule. See, e.g., N.J.S.A. 40A:9-172 (allowing back pay for municipal officer or employee dismissed or suspended illegally); N.J.S.A. 40A:14-23 (firefighters); N.J.S.A. 40A:14-151 (municipal police officers). Statutory bases for awards of back pay are also prevalent in the contexts of education, discrimination, unfair labor practices, and public employment generally. N.J.S.A. 2C:51-2c (providing *545 that if order requiring forfeiture of public office is overturned, employee may be entitled to back wages from date of forfeiture); N.J.S.A. 9:6-8.13 (allowing for an award of back pay if employee suffers adverse employment consequence as a result of employee "reporting an allegation of child abuse or neglect"); N.J.S.A. 10:3-1 (allowing award of back pay as remedy for certain age-based discrimination against government employees); N.J.S.A. 11A:2-22 (providing that Merit System Board can award back pay as remedy); N.J.S.A. 18A:6-30 (providing that any person holding "office, position or employment in the public school system of the state" can recover back pay for the period of an improper suspension or dismissal); N.J.S.A. 34:15-39.1 (allowing award of back pay to employee discriminated against because he or she sought worker's compensation benefits). The Legislature's approval of awards of back pay as a remedy for an employer's improper conduct is clear.
Awards of back pay are also essential to stability in labor relations. See N.J.S.A. 34:13A-2 (discussing legislative policy to promote stability in labor relations). In Galloway, 78 N.J. at 16, 393 A.2d 207, we held that the Public Employment Relations Commission could order back pay as a remedy for an unfair labor practice:
Denying PERC the ability to award back pay where that remedy is necessary to cure the effects of an unfair practice would substantially thwart the legislative goal of promoting peaceful public employment labor relations. See N.J.S.A. 34:13A-2. As the above-cited federal cases demonstrate, back pay awards play a critical role in the safeguarding of employee rights. Public employees victimized by unfair practices committed by employers or employee organizations could not truly be made whole if PERC's remedial powers lacked the "teeth" provided by the authority to award back pay, whose deterrent effect is considerably more forceful than that embodied in a cease and desist order.

[Ibid. (emphasis added).]
We have thus recognized the importance of back pay awards to public sector labor relations.
We further note that the stability of labor relations, "industrial peace" as it is termed in the private sector, depends largely on collective negotiations agreements. And the heart of any such agreement is the grievance and arbitration procedure. That is the mechanism for resolving violations of the collective negotiations agreement. Because employees do not have the right to strike in the public sector under our common law, Bd. of Educ. v. New Jersey Educ. Ass'n, 53 N.J. 29, 36, 247 A.2d 867 (1968), and because most agreements in the private sector prohibit strikes over contract violations, arbitration rights and remedies must be effective if we are to preserve labor peace. Otherwise, the resultant agreements and the incorporated arbitration remedies would become meaningless.
Just as good labor management relations depend on collective negotiations agreements that contain effective arbitration provisions (in lieu of the right to strike), in turn the usefulness of the arbitration provisions depends on effective remedies when the contract is violated if the contract is to provide stability. If we prohibit an arbitrator from awarding back pay, we eviscerate the contract. Back pay is the lifeblood of any arbitration procedure because without back pay there is only a right without a remedy. In the context of labor relations, the lack of a remedy presents a substantial threat to a peaceful and productive workplace. Such *546 protections are necessary if the "quality and morale of public officers and employees [is to] improve []." Governmental Officers, supra, 15 Rutgers L.Rev. at 532.
The State argues that the abrogation of the rule in this case would result in the State's paying two employees for work done by only one of them, and that we must guard against providing such "windfalls" to public employees. Stripped of the rule's theoretical underpinnings, this case is simply about the employer's unwillingness to honor a contractual obligation, a common problem in both the private and public sector. But payment here is not a gift. Cf. Gauer v. Essex County Div. of Welfare, 108 N.J. 140, 150, 528 A.2d 1 (1987) ("`[C]ompensation paid to public employees, whatever the label, is not a gift so long as it is included within the conditions of employment either by statutory [direction] or contract negotiation.'") (quoting Maywood Educ. Ass'n, Inc. v. Maywood Bd. of Educ., 131 N.J.Super. 551, 557, 330 A.2d 636 (Ch.Div.1974)). There is no violation of public policy for a public employer to honor its moral and legal obligation to make whole employees when there are violations of a statute or contract. The sanctity of the contract and the rights of employees under that contract eclipse the financial concern that a public employer may have to pay twice. We are confident that the State will not frequently commit similar violations in the future.
"The essence of the common law is its adaptability to changing circumstances." Atl. City Convention Ctr. Auth. v. S. Jersey Pub'g Co., Inc., 135 N.J. 53, 64, 637 A.2d 1261 (1994). "[E]ach time a rule of law is applied it [must] be carefully scrutinized to make sure that the conditions and needs of the times have not so changed as to make further application of it the instrument of injustice." State v. Culver, 23 N.J. 495, 505, 129 A.2d 715, cert. denied, 354 U.S. 925, 77 S.Ct. 1387, 1 L.Ed.2d 1441 (1957). We will not hesitate to abandon and reject a common law rule that has outlived its usefulness. Immer v. Risko, 56 N.J. 482, 487, 267 A.2d 481 (1970).
The no work, no pay rule has been called "harsh," Township of Springfield, supra, 73 N.J. at 7, 372 A.2d 286, a description befitting the culture that begat it. For it is no coincidence that the rule was established in 1859, near the height of the Industrial Revolution and on the eve of the Civil War. We do not suggest that those broad phenomena precipitated this specific rule. However, the rule's emergence was both a symptom and a reflection of a society then in transition between an agrarian and an industrial economy. Employers often considered workers as chattels or raw materials. Employees were treated little better than serfs, and sometimes worse. Equality was not a hallmark of the employment relationship; exploitation was its touchstone. It was, after all, the time of Dickens and Stowe, when the problem was far worse, often "work and no pay" as much as "no work, no pay."
Four decades ago a commentator characterized the rule as "an out-moded common-law doctrine formulated over a century ago." Governmental Officers, supra, 15 Rutgers L.Rev. at 516. That comment, unlike the rule, has withstood the test of time. Admittedly, it has taken a century and a half to recognize that the no work, no pay rule is both harsh and unnecessary. However, "[w]isdom too often never comes, and so one ought not to reject it merely because it comes late." Immer, supra, 56 N.J. at 495, 267 A.2d 481 (quoting Henslee v. Union Planters Nat'l Bank, 335 U.S. 595, 600, 69 S.Ct. 290, 293, 93 L.Ed. 259, 264 (1949) (Frankfurter, J., dissenting)). For the reasons stated *547 above, we abolish the no work, no pay common law rule.
Reversed and remanded.
VERNIERO, J., concurring in part, dissenting in part.
I join the Court in eliminating the "no work-no pay" rule from our common law. However, I agree with Justice LaVecchia's analysis in respect of the meaning of "permitted by law" as that phrase is used in the parties' agreement. Under our tripartite system, executive agencies may act only by virtue of an expressed or implied grant of authority from a legislative enactment or constitutional provision, or a judicial directive interpreting either of those sources. Silverman v. Berkson, 141 N.J. 412, 416-17, 661 A.2d 1266, cert. denied, 516 U.S. 975, 116 S.Ct. 476, 133 L. Ed.2d 405 (1995). Moreover, as a general rule, implied grants of authority to agencies are carefully circumscribed. See Playmates Toys, Inc. v. Dir., Div. of Taxation, 162 N.J. 186, 742 A.2d 968 (1999). Unlike the majority, I do not find an expressed or implied grant of authority to permit a back-pay award in this setting. On that narrow basis, I would affirm the judgment of the Appellate Division.
LaVECCHIA, J., dissenting.
The majority asserts, in sweeping language, that the common-law rule of "no work, no pay" no longer serves any appropriate governmental purpose and should be interred. It pronounces the rule to be an "anachronism," and "harsh and unnecessary," and finds, in light of those pronouncements, that plaintiffs here are entitled to receive back pay for lost opportunities to work overtime as awarded by the arbitrator appointed pursuant to the dispute-resolution provisions of the collective-negotiations agreement.
I respectfully dissent from the majority's decision. My disagreement with the decision is on several levels. First, I disagree with the majority's conclusion that the no work, no pay rule lacks continuing vitality. In my view, the rule rests on a solid analytical foundation, serves important governmental interests, and should continue to be respected. The rule provides an important protection for the public fisc that should not be cast aside lightly.
Moreover, I do not believe it was necessary for the majority to reach the question whether the common-law rule of no work, no pay should continue. In its zest to abrogate the common-law doctrine of no work, no pay, the majority mischaracterizes this Court's decision in Communications Workers of America v. Monmouth County Board of Social Services, 96 N.J. 442, 476 A.2d 777 (1984). Communications Workers involved a similar back-pay dispute in the context of an arbitrator's award for breach of a public-sector-collective-negotiations agreement. There are no meaningful distinctions between the operative provisions of the current agreement and the one before the Court in Communications Workers. Because the agreement in this case obviously was signed long after the 1984 Communications Workers decision, the parties must be deemed to have made their bargain in light of-and consistent with-the teaching of that decision. The principles espoused in Communications Workers, therefore, should guide us in the resolution of this case. Although the majority cites to Communications Workers, it does not follow that decision. The issues in this case, when properly analyzed in light of Communications Workers, can yield but one conclusion: the arbitrator's award of back pay exceeded his authority under the collective-negotiations agreement, and the overtime award should be vacated.

*548 I. Arbitrator's Authority to Award Back Pay

A.
Communications Workers did not reach the penultimate issue whether the no work, no pay rule should be abrogated because it recognized the necessity to address first the basic issue presented in all contract disputes: What had the parties agreed to? Justice Schreiber recognized that unless one could conclude that the parties to the contract had delegated to the arbitrator the power to award back pay as a remedy for a delay in a promotion, there was no need to reach the further question whether it was lawful for the parties to so agree. Id. at 455, 476 A.2d 777. After analyzing the contractual language, Justice Schreiber concluded that the parties in that case had not bestowed on the arbitrator the power to award back pay for the specific contract violation there involved. Id. at 452, 476 A.2d 777. An analysis of the collective-negotiations agreement at issue here yields the same conclusion.
The arbitrator's authority to resolve a given dispute or to provide a specific remedy for a breach depends, in the first instance, on whether the parties to the agreement have delegated that power to him. Id. at 448, 476 A.2d 777; Kearny PBA Local # 21 v. Town of Kearny, 81 N.J. 208, 217, 405 A.2d 393 (1979); Ridgefield Park Educ. Ass'n v. Ridgefield Park Bd. of Educ., 78 N.J. 144, 155, 393 A.2d 278 (1978). The starting point for our analysis, therefore, is the language of the parties' agreement.
The arbitration clause in the agreement provides:
c. The arbitrator shall not have the power to add to, subtract from, or modify the provisions of this Contract or laws of the State, or any policy of the State or subdivision thereof or to determine any dispute involving the exercise of a management function which is within the authority of the State as set forth in Article II, Management Rights, and shall confine his [or her] decision solely to the interpretation and application of this Contract.... The arbitrator may prescribe an appropriate back-pay remedy when he finds a violation of this Contract, provided such remedy is permitted by law and is consistent with the terms of this Contract. If the arbitrator renders a back pay award, then in accordance with State policy, appropriate benefits will be restored to the employee for the period of time covered by the back pay award.

[Emphasis added.]
There are two significant aspects to that clause. First, it limits the arbitrator's power to the four corners of the agreement. Only disputes concerning rights traceable to the agreement are arbitrable, and the arbitrator has the power to provide remedies only to the extent the parties lawfully have agreed to permit those remedies for the pertinent contract violation. The second significant aspect of the language of the arbitration clause is that it allows back pay as an appropriate remedy for a contract violation, "provided such remedy is permitted by law." (Emphasis added).
The arbitration clause here is indistinguishable from the arbitration clause before the Court in Communications Workers. That clause was described by the Court:
Under the terms of the negotiated agreement in this case, unresolved contract grievancesgrievances involving alleged `misinterpretation or mis-application of the terms' of the agreement-are subject to arbitration, and noncontractual grievances generally are not.

*549 The agreement also provides that `[t]he arbitrator shall not have the power to add to, subtract from, or modify the provisions of this Agreement and shall confine his * * * decision solely to the interpretation and application of this Agreement.' Moreover, it states that `he shall confine [himself] to the precise issue for arbitration and shall have no authority to determine any other issues not so submitted to him * * *, nor shall [he] submit observations or declarations of opinions which are not essential in reaching the determination.'
[Communications Workers, supra, 96 N.J. at 449, 476 A.2d 777 (footnote omitted).]
Further, Justice Schreiber discussed
specific language explicitly circumscribing the arbitrator's authority with respect to back-pay awards. The agreement provides that the arbitrator may `prescribe an appropriate back pay remedy' only when there is a violation of the agreement, and `provided such remedy is permitted by law and is consistent with the terms of [the] Agreement, except that [he] may not make an award which exceeds the Welfare Board's authority.'

[Id. at 451, 476 A.2d 777.]
The contract language reviewed in Communications Workers clearly provided that the terms of the negotiated agreement, and the details of the law, set specific boundaries on the arbitrator's substantive authority to make back-pay awards.
Both the words of empowerment of the arbitrator, and the language limiting the authority of the arbitrator, are substantively identical in this case. As Justice Schreiber pointed out in Communications Workers, the form of arbitration clause that limits the arbitrator's authority to resolving disputes arising out of the terms of the agreement and denying him the authority to modify it, represents a "narrow" delegation of authority, rather than a "broad" one. Id. at 449, 476 A.2d 777. As a consequence, only disputes involving rights traceable to the agreement are arbitrable, and "it is also presumed that [the parties] intended that their dispute be resolved in accordance with the law." Id. at 450, 476 A.2d 777. Furthermore, "[t]he parties in a public employment case cannot clothe the arbitrator with unbridled discretion, `for public policy demands that inherent in the arbitrator's guidelines are the public interest, welfare and other pertinent statutory criteria.'" Id. at 450-51, 476 A.2d 777 (quoting Kearny PBA Local # 21, supra, 81 N.J. at 217, 405 A.2d 393). Nor can a public entity bestow power on an arbitrator that is beyond that delegated to it. See State v. State Supervisory Employees Ass'n, 78 N.J. 54, 79, 393 A.2d 233 (1978) (stating that "negotiated agreement with respect to matters beyond the lawful authority of the public employer is impermissible").
Thus, as in Communications Workers, our task in this case, involving a substantively identical arbitration and back-pay clause, is to determine whether the agreement envisioned that back pay was to be a permitted remedy for lost overtime opportunities, and whether that is a remedy "permitted by law." The Communications Workers decision instructs us how to approach those interpretive issues. First, one must look to the language of the agreement to ascertain whether its terms "expressly provide for back pay" for the alleged violation. Communications Workers, supra, 96 N.J. at 451, 476 A.2d 777. In Communications Workers, Justice Schreiber found that the text of the agreement provided no evidence that the parties intended that back pay should be awarded for failure to promote, because it "provided *550 by its terms for an increase in salary only from the date that an employee is actually promoted." Id. at 451-52, 476 A.2d 777. The arbitrator, therefore, was not authorized under the agreement to provide back pay as a remedy for failure to promote.
The contract here similarly provides for "overtime hours accrued in excess of the normal hours of the established work week. These compensation credits shall be taken in compensatory time or in cash." As was the case in Communications Workers where the language spoke in terms of an increase from the date of promotion, the language here bespeaks overtime compensation for overtime worked. There is no reference to back pay as a remedy for lost overtime opportunity, and nothing to indicate that that is what the parties intended.
The failure to tie the provision of back pay as a remedy to a specific violation cannot be explained as an oversight. The contract at issue here was negotiated well after the Court's unanimous decision in Communications Workers, and the parties were on notice about how this Court had construed the language of the identical arbitration and back-pay provisions. Nonetheless, the parties elected to insert into their agreement the same provision that this Court had concluded in Communications Workers did not vest the arbitrator with the power to award back pay. They knew, therefore, that they had to tie the allowance of back pay to the specific violation to allow the arbitrator to provide that remedy. They did not do so, and "the arbitrator had no authority under the negotiated agreement to award back pay under these circumstances." Id. at 452, 476 A.2d 777. Only one construction of the contract is possible: the parties did not intend to vest the arbitrator with power to order back pay for lost overtime opportunities.
The majority attempts to circumvent Communications Workers through circuitous reasoning. The majority cites to the principle that courts should defer to an arbitrator when his decision is "reasonably debatable" as support for its conclusion. The presumption, however, cannot carry the day here. The arbitrator's decision is bottomed exclusively on his interpretation of the arbitration clause of the contract to conclude that the parties intended a back-pay remedy. That arbitration clause is identical to the clause in Communications Workers that this Court said is narrow and does not itself confer a back-pay remedy. We held in that case that the parties must indicate in a separate provision that they intend a back-pay remedy for a specific contract violation.
The majority next advances its own newly fashioned reason for why the overtime clause supports the conclusion that the parties intended to award back pay for lost overtime opportunities. It asserts that the contract's reference to overtime hours "accrued" in the overtime section demonstrates "that the parties did not intend to preclude back pay awards for overtime violations by imposing a prerequisite of actual work under the overtime provisions." Ante at 519, 780 A.2d at 534. The majority, however, does not explain why it is that given the significance that it attributes to the word "accrued," the parties never advanced that argument before the arbitrator, the Appellate Division, or this Court. Nor did the arbitrator make any finding based on the majority's interpretive theory. Nothing appears in the record to support the majority's strained reading of the term "accrued" found in the overtime clause, or suggests that the parties intended that the term "accrued" in this contract meant what the majority now *551 says it means. Indeed, since at that time the no work, no pay doctrine retained its vitality in all instances except where legislative exceptions had been created (and none existed for lost overtime opportunities), the majority's argument that the parties believed they were authorizing backpay penalties through the term "accrued" lacks credibility.
In sum, the majority cannot resort to the familiar refrain that a court must defer to an arbitrator's finding if the finding is "reasonably debatable" because the arbitrator never made the finding relied on by the majority to circumvent our prior holding in Communications Workers, namely that the overtime provision's use of the term "accrued" signified an intention by the parties to provide a back-pay remedy. The arbitrator found instead that the arbitration provision's language signified the parties' intent to provide a back-pay remedy generally for contract violations. Thus, on the question whether the parties intended here to provide a back-pay remedy for lost overtime opportunity, the arbitrator's ruling is not entitled to any deference. It flies in the face of the earlier specific holding of this Court that an identical arbitration clause did not constitute itself an authorization to award back pay; other specific evidence of express intent by both parties to provide a monetary remedy for a specific violation of contract provisions was required. Communications Workers, supra, 96 N.J. at 452, 476 A.2d 777.

B.
Plaintiff's claim for back pay in this case fails for yet another reason. The contract limits the power to prescribe back pay to circumstances where the remedy is "permitted by law." In my opinion, in order to satisfy that requirement, there must be affirmative legislative authorization to the Executive to incur the liability of a back-pay remedy for the specific violation. I know of none, and the majority cannot cite to one. That prerequisite is not met by a conclusion that the remedy is not prohibited by law, but that seems to be the premise of the majority's decision.
Because there does not appear to be any statute in effect that can be read sensibly or reasonably to permit a back-pay award, we cannot construe the contract as bestowing on the arbitrator the authority to award back pay for the alleged violations. There must be authority for the State to make such a concession. A public entity possesses only such authority as is delegated to it by the Legislature either expressly or by fair implication. Silverman v. Berkson, 141 N.J. 412, 416-17, 661 A.2d 1266 (1995) ("Government agencies have only those powers the Legislature confers on them."); General Assembly v. Byrne, 90 N.J. 376, 393, 448 A.2d 438 (1982) ("[I]n our system of government, the Legislature and not the Executive must make the law. Administrative agency power derives solely from a grant of authority by the Legislature."). The authority to agree to the liability of back pay as a contractual remedy ultimately must come from the Legislature. Executive agencies have the power to bind the State only where there has been a lawful delegation of authority to do so. If there is no authority to act, no enforceable commitment has been made. Allen v. Fauver, 167 N.J. 69, 77, 768 A.2d 1055 (2001); see also Walsh v. State, 147 N.J. 595, 689 A.2d 131 (1997), rev'g on dissent, 290 N.J.Super. 1, 13-17, 674 A.2d 988 (App.Div.1996) (Skillman, J.A.D., dissenting) (holding that contract implied in fact not enforceable if beyond the legal authority of executive branch official purporting *552 to make promise). The abolition of the doctrine of no work, no pay cannot supply that authority. The abolition of that doctrine merely removes a common-law prohibition that heretofore existed. It does not represent an affirmative grant of power authorizing a State entity to agree to back pay for lost overtime opportunities.
The majority lastly responds to this dissent with an argument that the Commissioner of Corrections, or indeed any hiring authority, has implicit power to agree to pay "back pay" for lost overtime opportunities. The majority's implicit-authority analysis is frightening in its potential reach, and it is flawed analytically. The search here is for evidence of authorization with respect to liability for back pay for lost overtime opportunity. There is none. There simply is no statutory authorization to incur liability for a back-pay penalty for faulty compliance with the process by which overtime is meted out. This is not a question of compensation for overtime earned, for back pay is not being awarded for work performed. It is a penalty for erroneous noncompliance with rotational overtime and theoretically would require double overtime payment anytime the Department of Corrections made a mistake in the order in which union workers are called for overtime service.
The majority points to no authorization nor can it reasonably find authorization implicit in the constitutional provision concerning collective negotiation or in the statute that authorizes the Commissioner of Corrections to hire employees. Ante at 515-16, 780 A.2d at 531-32. In its zeal to rid the State of the "unfairness" of not paying for work not performed, the majority has overstated the Executive Branch's authority to bind the State to monetary penalties for public employees so long as those penalties arise in a collective negotiations agreement. The contract here had no agreement on back-pay liability for lost overtime opportunities, and even if there was such an agreement in the language of this contract, the Commissioner did not have authority to bind the State to that liability.

C.
For those reasons, I conclude that the arbitrator exceeded his authority in awarding back pay in this case and the arbitration award should be vacated. Whether one is of the view that the common-law doctrine of no work, no pay should continue, or not, plaintiffs cannot prevail on their contractual claim in any event. On the question whether the common-law doctrine of no work, no pay should be abrogated, however, I also disagree with the majority.

II. No work, no pay

The majority today abrogates the longstanding common-law doctrine of no work, no pay. It pronounces the doctrine to be outmoded. The majority relies heavily on legislative actions over the years creating exceptions to that doctrine as support for its conclusion. That reference to legislative action, however, provides no support to the majority, for the legislative exceptions to that doctrine have been carefully limited and, in this context, represent legislative acquiescence to the doctrine. Each time the Legislature chose to carve another thin slice from the doctrine's application, its failure to abrogate the doctrine in its entirety constitutes a reaffirmation of its continued vitality as well as its importance in protecting taxpayer dollars. The Legislature sought only to ameliorate harsh results that sometimes attend the application of the doctrine, not undercut it *553 altogether. Were the doctrine of no work, no pay of legislative origin, the majority's approach would quickly be dismissed. Implied repealers are uniformly disfavored. Township of Mahwah v. Bergen County Bd. of Taxation, 98 N.J. 268, 281, 486 A.2d 818, cert. denied, 471 U.S. 1136, 105 S.Ct. 2677, 86 L.Ed.2d 696 (1985); Brewer v. Porch, 53 N.J. 167, 173, 249 A.2d 388 (1969); Swede v. City of Clifton, 22 N.J. 303, 317, 125 A.2d 865 (1956). But reduced to its essence, that is precisely the effect of the majority's conclusion. The legislative actions over time provide no support to the majority and indeed counsel the opposite result.
The Legislature carefully has carved out instances where serious public-policy concerns militate to create a need for public dollars to be paid twice for work performed. The majority cites extensively to them, ante at 544-46, 780 A.2d at 533-39, but none pertain here. There is no legislative authorization to the Executive to incur liability requiring double payment for lost overtime opportunities because of errors in implementing negotiated procedures for overtime rotational assignment. It is noteworthy that even PERC's authority to provide a back-pay remedy for an unfair labor practice had to be grounded in statute. Galloway Township Bd. of Educ. v. Galloway Township Ass'n of Educ. Secretaries, 78 N.J. 1, 10, 15-16, 393 A.2d 207 (1978).
The no work, no pay doctrine remains a valid and necessary protection for our public fisc. The Court is gravely mistaken in casting it aside. I would not abrogate that valid doctrine. I perceive no need to reject sound common law that protects tax dollars simply to create a remedy here. And I certainly see no reason to address the question of abrogation of that doctrine because the parties' contract fails to authorize a back-pay remedy for lost overtime opportunities. Accordingly, I respectfully dissent.
Justice COLEMAN join in this opinion.
For reversal and remandmentChief Justice PORITZ and Justices STEIN, LONG, and ZAZZALI4.
Concurring in part: dissenting in part Justice VERNIERO1.
For affirmanceJustices COLEMAN and LaVECCHIA2.